ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL VI

| | | |
|---|---|---|
| MAYRA I. RIVERA MARÍN<br><br>APELANTE<br><br>V.<br><br>VPH MOTOR CORP. h/n/c TRIANGLE DEALERS DEL OESTE<br>AVE. JOHN F. KENNEDY, KM. 3.7, SAN JUAN, PR 00920<br><br>APELADA | KLAN202300891 | *Apelación* procedente del Tribunal de Primera Instancia, Sala de Aguada<br><br>Caso Núm.: SJ2021CV08395<br><br>Sobre: Represalias; Discrimen por sexo; Despido injustificado; Beneficios económicos; Acoso laboral; Procedimiento sumario de reclamaciones laborales; Ley núm. 2 del 17 de octubre de 1961; Según enmendada |

Panel integrado por su presidenta, la Jueza Ortiz Flores, el Juez Rivera Torres y la Jueza Rivera Pérez

Ortiz Flores, Jueza Ponente

## SENTENCIA

En San Juan, Puerto Rico, a 30 de noviembre de 2023.

Comparece la Sra. Mayra Rivera Marín (en adelante, Sra. Rivera o apelante) y nos solicita la revocación de la *Sentencia* dictada el 21 de septiembre de 2023 y notificada el 25 de septiembre de 2023 por el Tribunal de Primera Instancia, Sala Superior de Aguada. Mediante el dictamen recurrido, el foro de instancia dictó sentencia mediante la cual declaró ha lugar la moción de sentencia sumaria de la parte apelada, por lo que desestimó en su totalidad la querella presentada por la Sra. Rivera.[1]

Adelantamos que se expide el auto de *certiorari* y se confirma *Resolución* recurrida y se devuelve al Tribunal de Primera Instancia para adjudicar la reclamación de salarios y bonos bajo la *Ley de Procedimiento Sumario de Reclamaciones Laborales*, Ley Núm. 2 de 17 de octubre de

---

[1] Apéndice PP de la Apelación, págs. 663-687. El dictamen del cual se acude ante nos que fue titulado Sentencia no dispuso de la totalidad de las controversias lo cual la decisión judicial es una parcial. Sin embargo, dicho dictamen no cumplió con la formalidad estatuida en la Regla 42.3 de las Reglas de Procedimiento Civil, 32 LPRA Ap. V, R. 42.3. Así pues, el dictamen recurrido no adquirió la finalidad exigida para considerarse una sentencia revisable mediante un recurso de apelación. A tales efectos, al ser una *Resolución* acogemos el recurso presentado ante nuestra consideración como una petición de *certiorari* aunque conserve la clasificación alfanumérica asignada por la Secretaría de este Tribunal.

Número Identificador

SEN2023_____

1961, 32 LPRA sec. 3118, y la *Ley para Establecer la Jornada de Trabajo en Puerto Rico*, Ley Núm. 379 de 15 de mayo de 1948, 29 LPRA sec. 282.

I

La Sra. Rivera radicó una querella en contra de la parte apelada, VPH Motor Corp., mediante la cual reclamó compensación por despido injustificado, discrimen por razón de sexo, represalias y acoso laboral. Posteriormente, la parte apelada contestó la querella al alegar que el despido de la Sra. Rivera fue justificado puesto que una investigación interna arrojó que esta generó un ambiente de desasosiego, retó las instrucciones impartidas por sus supervisores, no siguió las normas administrativas, realizó comentarios en contra de la empresa, se comportó de forma poco cordial y no asistió o llegó tarde a los seminarios. Por tanto, sostuvo que el despido fue motivado por el buen funcionamiento de las operaciones de la empresa, tras estos brindarle múltiples oportunidades para que esta corrigiera su comportamiento.

Luego de varios trámites procesales, la parte apelada presentó una moción de sentencia sumaria mediante la cual argumentó que no existían controversias de hechos y que la querella estaba basada en meras generalidades sin hechos específicos. Precisamente, sostuvo que la apelante no logró identificar hechos concretos que demostraran que el despido tuvo ánimo discriminatorio. Por consiguiente, argumentó que la reclamación debía ser desestimada sumariamente por insuficiencia de prueba.

Por su parte, la apelante presentó una *Oposición a moción de sentencia sumaria en cumplimiento de orden*. Mediante esta adujo que había controversias sobre múltiples de los hechos propuestos por la apelada. Sostuvo que esta fue despedida por represalias por esta haber presentado una queja ante la apelada, por lo cual se trató de un despido injustificado. Además, argumentó que su entonces patrono incurrió en prácticas discriminatorias al no haber tomado medidas para resolver la falta de equidad en su lugar de trabajo, estos consistentes en las condiciones

de limpieza del baño y el trato desigual en la cotización de los vehículos *trade-in*.

El Tribunal de Primera Instancia, declaró ha lugar la moción de sentencia sumaria y formuló los siguientes hechos incontrovertidos fundamentados por la prueba acompañada a la moción de sentencia sumaria y su oposición:

1. La querellante comenzó a trabajar para VPH, el 25 de noviembre de 2019, mediante un contrato de empleo probatorio.
2. De conformidad con el contrato de empleo, la querellante comenzó a trabajar en VPH ocupando la posición de VIP Rep.
3. La oficina de la querellante era en el Departamento de Servicio.
4. El Sr. Charles Vaillant es el presidente de VPH.
5. El Sr. Frank Paonessa ocupaba el puesto de Chief Operating Officer de VPH al momento del despido de la querellante.
6. Desde aproximadamente el año 2017, la Sra. Myrna López es asesora de Recursos Humanos de VPH.
7. Como asesora de Recursos Humanos para VPH, la Sra. López evalúa situaciones de personal y, a base de las recomendaciones del gerente, esta les advierte sobre lo que es más recomendable que se haga. No obstante, la decisión la toma el gerente.
8. La Sra. López forma parte del proceso de intervención, pero no es quien toma la decisión de despedir empleados.
9. La Sra. López participa en investigaciones que sean necesarias ante reclamaciones de los empleados y contrata al personal necesario para hacer las investigaciones cuando estima procedente.
10. El Sr. Ismael Medina era el gerente general de VPH al momento del despido de la querellante.
11. El Sr. Jesús González era el gerente de vehículos usados de VPH durante el periodo de empleo de la querellante.
12. El Sr. Luis Velázquez era el gerente de vehículos nuevos Chrysler durante el periodo de empleo de la querellante.
13. Los gerentes de las diferentes áreas de VPH supervisaban a la querellante dependiendo del tipo de gestión que esta estuviera realizando, a saber: el Sr. Tomás Rosa en el área de servicio, el Sr. Luis Velázquez como gerente de vehículos Chrysler, el Sr. Jesús González como gerente de vehículos usados y el Sr. Dennis González en el área de vehículos Nissan.
14. La Sra. Tania Vidal era la gerente Customer Relationship Management ("CRM") al momento del despido de la querellante.
15. Las funciones de la querellante como empleada de VPH eran, entre otras: a) lograr que los clientes del dealer que llevaran sus carros a servicio o cambiaran sus vehículos

comprando un nuevo auto; b) entrar en el programa Dealer Socket la información del cliente, notas relacionadas a las gestiones de venta con ese cliente, notas sobre lo que iba hablando con el cliente, citas pautadas y si se le vendió un vehículo; c) realizar llamadas de seguimiento a los clientes; d) asistir a reuniones diarias del grupo de ventas; e) tomar adiestramientos y, f) entrar toda la data de los clientes en el sistema conocido como CRM.

16. Las notas que la querellante debía entrar al sistema tenían que ser entradas tan pronto atendiera al cliente.

17. El horario de trabajo de la querellante como VIP Rep. era de 9:00 a.m. a 6:00 p.m. de lunes a viernes.

18. La querellante era la única empleada que tenía la función de atender clientes del área de servicio.

19. Además de su responsabilidad principal de prospectar ventas a clientes del área de servicio, a la querellante se le dio la oportunidad de realizar ventas a clientes que no fueran del área de servicio.

20. La Sra. Vidal daba seguimiento a la querellante y al grupo de vendedores sobre aspectos y adiestramientos de los sistemas de ventas de la empresa, incluyendo adiestramiento sobre Dealer Socket.

21. A diferencia del VIP Rep., los representantes de ventas no realizaban funciones de ventas a clientes del Departamento de Servicio.

22. Los ejecutivos de ventas de VPH tenían que trabajar sábados.

23. A la querellante nunca le requirieron trabajar sábados.

24. Como gerente, la Sra. Vidal era responsable de, entre otras cosas, supervisar que la querellante y los representantes de ventas cumplieran con entrar la información de los clientes en el CRM, que realizaran las llamadas de seguimiento a los clientes y darles seguimiento cuando identificaba que no se estaba siguiendo algún proceso.

25. CRM es el sistema de base de datos de clientes de VPH.

26. En el sistema CRM se recogen los datos de todos los clientes que llaman, escriben o visitan el concesionario para que los vendedores les den seguimiento a los clientes con el propósito de continuar el proceso de ventas y retener al cliente.

27. Mientras la querellante trabajó para VPH, el sistema CRM utilizado fue Dealer Socket.

28. El Departamento de Business Development Center ("BDC") es un complemento de CRM donde se documentan las comunicaciones con el cliente para asegurar que todos los clientes sean atendidos correctamente y que se les hayan brindado las oportunidades de ventas.

29. La Sra. Vidal estuvo encargada de ir al concesionario en Mayagüez para dar adiestramientos sobre el sistema Dealer Socket.

30. La Sra. Vidal realizaba visitas al concesionario de Mayagüez para dar seguimiento a los vendedores y a la querellante sobre el uso de CRM y BDC.

31. La Sra. Vidal personalmente brindaba adiestramientos de Dealer Socket a los vendedores y a la querellante.

32. Parte del trabajo de la Sra. Vidal era asegurarse de que la querellante en el puesto de VIP Rep., y los ejecutivos de ventas, utilizaran el sistema o la base de datos para asegurar que todos los procesos estuvieran conforme a lo que la compañía requiere.

33. La utilización de los sistemas tal como Dealer Socket era importante en términos del desempeño de los vendedores y de la querellante ya que era la manera de medir el trabajo, las llamadas y citas que estaban realizando.

34. Además del sistema Dealer Socket, existe un sistema de llamadas.

35. El registro de llamadas se integra a la base de datos.

36. Las instrucciones y el proceso de la empresa con relación a las llamadas con clientes es que las llamadas debían ser registradas en el sistema, con indicación del nombre del cliente, número de teléfono, notas de la llamada, y la unidad que el cliente interesa, en el momento de la llamada.

37. Durante su tiempo de empleo en VPH, la querellante recibió una amonestación escrita y una suspensión de empleo y sueldo.

38. El 15 de septiembre de 2020, a las 2:27 p.m., la Sra. Vidal envió un correo electrónico a la querellante orientándola sobre el proceso correcto al atender llamadas de clientes y le indicó que en una llamada se escuchó que tuvo 2 interrupciones y que eso hace que el cliente se sienta que no se respeta su tiempo.

39. El 15 de septiembre de 2020, a las 5:11 p.m., la Sra. Vidal le envió al Sr. Paonessa un correo electrónico indicándole lo siguiente:

Necesito hablar con usted sobre una llamada que me hiciera la Sra. Mayra Rivera indicando que se siente que ha sido de una forma ofensiva. La manera que me habló fue en un tono muy retante y no me sentí cómoda. Este es el trabajo que me corresponde como supervisora de BDC y CRM y le envoi (*sic*) correos a todos los vendedores. Me habló en un tono tan inaceptable que se escuchó en la oficina. Me dijo que lo llevaría al foro correspondiente y mi sugerencia fue reunirnos los tres. Aun así, me dijo que no que ella sería quien lo haría porque yo no tengo que estar en la reunión. De igual manera, aun así, le expliqué que no es mi intención que se sintiera así y que es mi rutina enviar los correos para mejorar el sistema.

40. El 17 de septiembre de 2020, la Sra. Vidal envió al Sr. Frank Paonessa un correo electrónico indicándole que, el 22 de junio de 2022, había referido al Sr. Medina el audio de una llamada en que la querellante le habló a un cliente con una palabra despectiva al explicarle lo que era un "S[cat] pack", y que la decisión del Sr. Medina fue que

hasta que no terminara los adiestramientos de Chrysler no podía recibir llamadas de venta.

41. El 5 de octubre de 2020, la Sra. Vidal envió un correo electrónico al Sr. Paonessa indicándole:

Hoy nuevamente recibí llamada de la Sra. Mayra Rivera indicando que siente que tengo algo personal en su contra. Me reclamó esta llamada que reasigné luego de discutirla con usted y enviársela a Luis Velázquez. Me indica que no siempre puede hacer las notas al momento porque a ella le pagan por vender. Además, me reclamó que a ella fue a la única persona que se le sacó de recibir llamadas luego de que la decisión tomada por el Sr. Ismael Medina fuera por una llamada en la que ella le dice al cliente "que era un Scat Pack utilizando una palabra fuera de lugar. Indica que se siente deprimida y que interesa reunirse con usted y conmigo al respecto. Entiendo que he sido respetuosa y justa al momento de tomar decisiones y es mi deber rescatar las llamadas que no se trabajan adecuadamente tal y como lo hago con todos los ejecutivos de venta. Le indiqué que si necesitaba algo que me lo enviara por escrito.

42. El Sr. Paonessa consultó a la Sra. López sobre la conducta de la querellante en sus llamadas a la Sra. Vidal y esta recomendó, y el Sr. Paonessa estuvo de acuerdo, que se impartiera a la querellante una amonestación escrita ya que ese tipo de conducta no está permitida.

43. El 9 de octubre de 2020, luego de discutir la situación con la Sra. López, el Sr. Paonessa se reunió con la querellante y le impartió la amonestación escrita por su conducta hacia la Sra. Vidal, según se desprende de los correos electrónicos del 15 de septiembre y 5 de octubre de 2020.

44. El 8 de febrero de 2021, la Sra. Vidal envió un correo electrónico al Sr. Charles Vaillant, presidente, indicándole que estuvo visitando la tienda de Mayagüez para darle seguimiento a la utilización del CRM y que, a pesar de haberse citado a un adiestramiento el 5 de febrero, la querellante no se presentó.

45. La Sra. Vidal le indicó al Sr. Vaillant que todos saben que es de suma importancia y parte de los requerimientos de la compañía estar en las reuniones propuestas por los gerenciales y los adiestramientos para ser más efectivos con los resultados.

46. El 8 de febrero de 2021, el Sr. Jesús González envió un correo electrónico al Sr. Carlos Vaillant, copiando al Sr. Charles Vaillant, al Sr. Ismael Medina y al Sr. Frank Paonessa, sobre "Procesos".

47. En el referido correo electrónico el Sr. González expresa, entre otras cosas, que la Sra. Rivera:

a. No sigue los procesos de la empresa.

b. No asiste a reuniones diarias de ventas y al preguntarle por qué no va a las reuniones, esta le expresa: "Yo nunca voy porque le pregunto a los muchachos y ellos me dicen que siempre están hablando de lo mismo".

c. No llega a tiempo en su horario de entrada.

d. No asistió a una reunión de Dealer Socket y de llamadas que el Sr. González coordinó con la Sra. Vidal el 5 de febrero.

e. Llegó tarde a la reunión de ventas del 8 de febrero y, cuando llegó, se mantuvo hablando o texteando sin atención.

f. Crea un ambiente tóxico en el Departamento de Ventas y le preocupa que ella entienda que no tiene supervisor y que puede hacer lo que le da la gana.

g. Hace comentarios negativos de la gerencia del dealer.

48. El 16 de febrero de 2021, el Sr. González presentó una queja escrita al Sr. Ismael Medina indicándole que, en presencia de otro empleado, la querellante le preguntó si estaba molesto y que, aunque el Sr. González le dijo que no, la querellante le indicó que ella nota cuando el se molesta porque se pone "colorado".

49. El Sr. González también indicó al Sr. Medina que ese día le preguntó a la querellante por un cliente para buscarlo en Dealer Socket y la querellante no había entrado la información en el sistema; que ese día la querellante tampoco asistió a la reunión de la mañana y que su forma de trabajar no se ajustaba a los procesos de la empresa.

50. La querellante indicó al Sr. González: "Oye, ¿yo te he hecho algo a ti? Porque cuando vengo donde ti te sientes molesto, se te pone la cara colorá".

51. El Sr. González sintió que fue una falta de respeto en el contexto y con la actitud que la querellante le dijo que se ponía "colorao".

52. El Sr. Ismael Medina consultó a la Sra. López sobre la queja del Sr. González y esta recomendó que se le impartiera una suspensión a la querellante por incurrir en falta de respeto y no seguir los procesos y normas de la empresa.

53. El 17 de febrero de 2021, el Sr. Medina se reunió con la querellante y le brindó la oportunidad de brindar su versión de los hechos.

54. El 17 de febrero de 2021, la querellante fue suspendida de empleo y sueldo por concluirse que esta le faltó el respeto al gerente, Sr. Jesús González, y por no seguir los procesos de la compañía.

55. La querellante desconoce quién tomó la decisión de suspenderla.

56. Una semana antes de la suspensión de la querellante, VPH suspendió al representante de ventas, Sr. Carlos Caraballo.

57. Durante su suspensión, al Sr. Carlos Caraballo lo sacaron del sistema ya que no podía realizar llamadas a clientes durante la suspensión.

58. El 18 de febrero de 2021, la querellante presentó una queja escrita ante la Sra. Myrna López alegando que la suspensión del 17 de febrero de 2021 fue un acto de discrimen por ser mujer.

59. La querellante alegó que los gerentes toman malas actitudes hacia esta por esta haber sido recomendada por el Sr. Vaillant para trabajar en la empresa.

60. El 21 de febrero de 2021, la querellante le envió un mensaje de texto al Sr. Charles Vaillant informándole sobre la suspensión y situaciones en el área de trabajo entre las que indicó que en la compañía hay "vendedores endrogados que se les cae la cara y no lo mandan para su casa".

61. La querellada realizó una investigación a raíz de la queja presentada por la querellante, el 18 de febrero de 2021.

62. La Sra. López contrató a la investigadora independiente, Lcda. Sonia Santana Sepúlveda, para que esta realizara la correspondiente investigación.

63. Como parte de la investigación, la querellante fue entrevistada en 2 ocasiones, siendo esta la primera y la última persona entrevistada.

64. Como parte de la investigación, la Lcda. Santana entrevistó también de manera individual a los siguientes empleados de VPH:
   a. Sra. Tania Vidal
   b. Sr. Frank Paonessa
   c. Sra. Melanie Andújar
   d. Sr. Luis Velázquez
   e. Sr. Dennis González
   f. Sr. Ismael Medina
   g. Sr. Hanz Vázquez
   h. Sr. Jesús (Jimmy) González
   i. Sr. Tomás Rosa
   j. Srta. Pamela Ruiz
   k. Srta. Isamar Pérez
   l. Sr. Elvin Ojeda
   m. Sr. Alberto Torres
   n. Sr. Emmanuel Ramírez
   o. Sr. Christian Rojas
   p. Sr. Carlos Caraballo
   q. Sra. Jesmir Pagán
   r. Sr. Roberto Cummings Rodríguez
   s. Sr. Charles Vaillant

65. El 18 de marzo de 2021, la Lcda. Santana rindió un informe que consta de 27 páginas y 8 anejos.

66. Con relación a la entrevista realizada a la querellante, a preguntas de la Lcda. Santana sobre los fundamentos de la querellante para alegar trato desigual, surge del informe de la licenciada Santana lo siguiente:
   a. "Ante preguntas directas de esta investigadora sobre sus fundamentos para alegar trato desigual por ser amiga del Sr. Vaillant y por ser mujer, según expuso en comunicación dirigida a la Sra. Myrna López del 18 de febrero de 2021, la señora Rivera Marín manifestó que percibe que 'le están poniendo el pie para que se vaya' y que le dañan las ventas para que ella no venda".
   b. "Al inquirírsele sobre los fundamentos que tiene para su percepción utilizó el siguiente ejemplo: que el sábado pasado, [entiéndase el 13 de marzo de 2021], el Sr. Luis Velázquez le quitó una venta y se la dio a otro vendedor […]". Indica que "había un cliente que ofrecía $45,000 por un vehículo el cual Luis quería que se vendiera en $49,000; que Luis no le aprobó la venta por la suma que su cliente estaba dispuesto a pagar y le quitó la llave del vehículo" y que "otro vendedor vendió el vehículo en $47,000".
   c. "Se le requirió por la suscribiente alguna otra instancia sobre sus alegaciones y nos informó que no recordaba otra".
   d. "Manifestó que Luis [Velázquez] y Jimmy [González] la ven como una persona frágil y le hacen cosas que no les hacen a los vendedores porque cuando se lo hacen a los vendedores 'estos le tiran para atrás'; que ella conoce el modus operandi de Luis y que le está haciendo la vida imposible para que ella se vaya; que en ocasiones ella ha

preguntado cuándo llegan vehículos nuevos y le dan la información equivocada".

e. "Añadió que Luis [Velázquez] le da los clientes del dealer socket de ella a otro vendedor de nombre David y que les hace lo mismo a otros vendedores; que en una ocasión Luis la insultó como si ella fuese un hombre, de forma agresiva y gritándole en presencia de Hanz y Elvin (del área de financiamiento) quienes tuvieron que intervenir".

f. "En cuanto a su alegación de que los gerentes la tratan diferente porque es amiga del Sr. Charles Vaillant manifestó que ella no es amiga estrecha ni íntima del señor Vaillant y que su alegación se refiere a que cuando ocurre cualquier cosa en el concesionario los demás empleados le dicen "ahora ve y llama a Vaillant'".

67. La Lcda. Santana entrevistó al Sr. Hanz Vázquez y al Sr. Elvin Ojeda y ninguno de ellos mencionó el incidente del Sr. Luis y la querellante, a pesar de que esta última relató que ocurrió en presencia de estos.

68. Con relación al testimonio de la Sra. Tania Vidal durante la investigación, surge lo siguiente del informe de la Lcda. Santana: Opina la entrevistada que Mayra es una persona controversial; que le gusta indisponer a los compañeros unos contra otros; que es una persona 'tóxica' y que es muy difícil trabajar con ella. Añade que ha observado que a Mayra no le gusta ser supervisada.

69. En lo concerniente al testimonio de la Sra. Melanie Andújar durante la investigación, surge lo siguiente del informe de la Lcda. Santana:

a. "La Srta. Andújar manifiesta que tiene reservas cuando habla con Mayra ya que esta trata de poner palabras en la boca de ella las cuales no ha dicho".

b. "Añadió que Mayra siempre está comparando la forma en que se pagaban comisiones en Auto Grupo versus Triangle y hablando de que no se gana lo que ella esperaba".

c. "La Srta. Andújar opina que Mayra trata de crear bandos en el lugar de trabajo y de poner a unos empleados en contra de otros".

70. En lo concerniente al testimonio del Sr. Luis Velázquez durante la investigación, surge lo siguiente del informe de la Lcda. Santana:

a. "En relación a la Sra. Mayra Rivera manifestó que no tiene criterios para hablar bien o mal de ella, pero que esta tuvo situación personal sobre contestaciones inadecuadas el 25 de septiembre de 2020, por lo que ese día remitió un mensaje al señor Ismael Medina. El referido mensaje lee como sigue: 'Ismael te comento que en la tarde la vendedora Mayra le está vendiendo a la gritter un auto de la que eran de servicio compass, que no tengo ningún problema, a la vendedora le pido la llave del vehículo por que se quedó con ella y tenía otro cliente que quería verla y le comentó y me salió con malas crianzas que no le voy a aceptar. Ningún vendedor tiene el derecho de aguantar llaves para nadie.' (sic)

b. "Expresa que trata de evitarla para no tener enfrentamientos, pero le consta que no le gusta seguir instrucciones y le gusta contaminar a los compañeros para ponerlos contra la gerencia".

c. "Añade el señor Velázquez que a pesar de que la señora Rivera trabaja en ventas en el área de servicio, se le brinda la oportunidad de estar en el turno de ventas

general, ya que ella se quejaba y quería estar en los dos lados".

d. "Opina el entrevistado que la señora Rivera no es persona en la que se pueda confiar; que no comparece a las reuniones; que no se deja supervisar; que cualquier situación que tiene en lugar de llevarla donde él, la lleva al Sr. Dennis González, gerente de Nissan".

71. En lo concerniente [al] testimonio del Sr. Ismael Medina durante la investigación, surge lo siguiente del informe de la Lcda. Santana:

a. Tiene conocimiento de que la Sra. Rivera ha tenido situaciones con Melanie.

b. "En cuanto al último incidente con Jimmy expresa que es la segunda ocasión; que la primera ocasión ocurrió a principios de la pandemia y se trató de un vehículo que la señora Rivera quería mostrar y la llave estaba extraviada. Los comentarios de la señora Rivera hacia la compañía fueron despectivos y comparando siempre su experiencia con Auto Grupo".

c. "Opina que la actitud de la señora Rivera es poner unos empleados contra otros; que justifica sus actuaciones equivocadas con lo que ella percibe es equivocación de los demás. Asegura […] que jamás ha visto ningún empleado del dealer que aparente estar bajo los efectos de drogas durante horas laborables".

d. "En cuanto a los alegados altercados entre gerentes mencionados por la señora Rivera al señor Vaillant, informa el entrevistado que hubo discusión fuerte entre dos gerentes: Luis Velázquez y Hanz Vázquez hace aproximadamente seis (6) o siete (7) meses que no había clientes presentes y que ambos fueron amonestados por escrito por él. Aparte de lo anterior, no tiene conocimiento de que haya habido algún incidente entre gerentes que amerite amonestación u otra acción administrativa".

72. En lo concerniente al testimonio del Sr. Hanz Vázquez durante la investigación, surge del informe de la Lcda. Santana que el Sr. Vázquez "asegura haber escuchado a la Sra. Rivera hacer comentarios criticando la compañía y comparándola con otros lugares" y que "afirma que nunca ha tenido queja de sus supervisores ni ha observado a ningún vendedor o empleado que aparente estar bajo los efectos de drogas".

73. En lo concerniente al testimonio del Sr. Jesús González (Jimmy) durante la investigación, surge lo siguiente del informe de la Lcda. Santana:

a. "Al principio no tenía nada malo que decir de ella [querellante], pero no sabe qué le ha pasado que últimamente ha presentado una actitud que no es buena."

b. "Manifiesta el señor González que la señora Rivera se resiste a seguir los procesos de 'dealer socket' lo que produce problemas al departamento; que tiene mucho cuidado con ella porque se comunica con uno 'fuera de lugar'".

c. "Expresó el señor González con relación al incidente mencionado en este informe por otro entrevistado (el extravío de la llave de auto que la señora Rivera quería mostrar) que esta llegó a su oficina expresando 'esto siempre es una mierda, por eso no me gusta trabajar, porque es una mierda'; 'no te preocupes que esto lo voy a llevar más arriba'. El testigo puso el incidente por escrito a su jefe inmediato, el Sr. Ismael Medina."

d. "Añadió que la señora Rivera no asiste a las reuniones, aunque últimamente ha aparecido. El entrevistado le

preguntó la razón para que no asistiera y ella le dijo que hablaba con los muchachos y que le decían que siempre se hablaba lo mismo".

e. "En cuanto a la reciente suspensión de la señora Rivera manifiesta que ella se acercó y le preguntó por los costos de un vehículo y que él le pidió que le dijera cuál era el cliente para buscarlo en el Dealer Socket; que esta le contestó que no lo tenía en el Dealer Socket porque el cliente era de servicio y tenía mucha prisa y que ella sabía seguir los procesos al pie de la letra; que el contestó que solo quería que lo entrara al Dealer Socket. Es entonces que la señora Rivera le hace el comentario de manera irrespetuosa de que ella nota que siempre que le pregunta algo el se molesta y que se ponía 'colorao' siempre que ella iba a su oficina".

f. "Asegura que no tiene nada personal contra la Sra. Rivera y que nunca ha presenciado incidentes que sugieran que los gerentes puedan irse a las manos ni vendedores drogados o que aparenten estarlo en el lugar de trabajo".

74. En lo concerniente al testimonio del Sr. Tomás Rosa durante la investigación, surge lo siguiente del informe de la Lcda. Santana: "Manifiesta que la señora siempre tiene 'altanería' de que conoce a Charlie (señor Vaillant); que la ha escuchado decir que la compañía es una mierda; que alardea mucho de que tiene buena relación con los dueños de Auto Grupo y que los conoce hace 30 años. Recuerda que en una ocasión estaban hablando de algo y ella expresó 'entonces voy a tener que llamar a Charlie', refiriéndose al señor Vaillant. Asegura que nunca ha visto a ningún vendedor drogado […]".

75. En lo concerniente al testimonio de la Sra. Isamar Pérez durante la investigación, surge lo siguiente del informe de la Lcda. Santana: "Ha presenciado discusiones entre gerentes sobre asuntos laborales, pero jamás intentos de agresión de uno contra otro. Igualmente ha escuchado comentarios de la señora Rivera quejándose de la compañía. Todo el tiempo está diciendo que es amiga del dueño".

76. En lo concerniente al testimonio del Sr. Elvin Ojeda durante la investigación, surge lo siguiente del informe de la Lcda. Santana:

a. "Opina que la Sra. Rivera es tremenda persona, buena vendedora, pero en ocasiones quiere hacer las cosas como le da la gana".

b. "Se resiste al 'dealer socket'; hace comentarios como que 'esto es una mierda'; si la transacción no se le hace fácil ella se queja y se molesta con el sistema; la he escuchado decir que en Auto Grupo todo era mejor que en Triangle".

c. "Expresa el Sr. Ojeda que "nunca jamás (sic) ha visto ningún trabajador drogado".

77. En lo concerniente al testimonio del Sr. Alberto Torres durante la investigación, surge lo siguiente del informe de la Lcda. Santana:

a. "Ha escuchado a la señora Rivera decir 'esto es una mierda' y que en Auto Grupo las cosas eran mejores".

b. "Expone que en Triangle se le dieron unas concesiones a la señora Rivera (como no trabajar los sábados) que no se le han dado a nadie".

c. "Añadió que ella presume todo el tiempo que de que tiene relación personal con el señor Vaillant".

d. "El señor Torres estima que la señora Rivera es buena vendedora, pero tiene que dejar a un lado el pasado, cuando trabajaba en otro lugar, y enfocarse en el presente; que ella quiere hacer las cosas a su manera y en Triangle hay reglas".

78. En lo concerniente al testimonio del Sr. Emmanuel Ramírez durante la investigación, surge lo siguiente del informe de la Lcda. Santana:

a. "Conoce a la Sra. Mayra Rivera de su relación en el trabajo. Dicha relación fue buena al principio, pero cierto día ella le hizo alegación porque entendía que la venta que el estaba atendiendo les pertenecía a los dos. Dicho reclamo lo hizo en presencia de los clientes. El entrevistado le dijo 'vamos a dejarlo aquí y resolvemos con los gerentes luego' para que ella dejara de argumentar delante de los clientes. Expresa que la situación fue muy desagradable y que la actuación de ella fue inapropiada".

b. "El señor Ramírez estuvo presente cuando se suscitó el incidente que provocó la más reciente suspensión de la señora Rivera y su impresión fue que la actitud de ella fue provocar a Jimmy; que le decía 'no te pongas así de colorado', 'estás molesto' y a pesar de que Jimmy le contestaba que no estaba molesto, que había estado en la playa, ella seguía insistiendo en lo anterior".

c. "Añade que ha escuchado a la señora Rivera quejarse en general del lugar de trabajo".

79. En lo concerniente al testimonio del Sr. Christian Rojas durante la investigación, surge lo siguiente del informe de la Lcda. Santana: "Expresa que nunca ha visto a ningún vendedor drogado ni que aparente estarlo. […]. Ha escuchado a Mayra decir que 'esto es una mierda', refiriéndose al trabajo".

80. En lo concerniente al testimonio de la Sra. Pamela Ruiz y del Sr. Dennis González, surge del informe de la Lcda. Santana que ambos indicaron que nunca han visto empleados drogados o que aparenten o demuestren estarlo.

81. El 18 de marzo de 2021, concluida la investigación, la Lcda. Santana rindió un informe con los hallazgos de la investigación y recomendaciones que entregó a la Sra. Myrna López.

82. En el informe de investigación la Lcda. Santana concluyó y recomendó lo siguiente:

"El balance de la información recopilada por la suscribiente nos lleva a concluir que no existen fundamentos para establecer que la Sra. Mayra Rivera Marín haya sido víctima de discrimen por razón de sexo; por tener alegada relación personal con el dueño de la empresa y/o por ninguna otra razón. Por el contrario, la prueba demostró que: (1) Triangle creó una plaza exclusivamente para ella de manera que no tuviese que trabajar sábados ni domingos, como era su deseo, privilegio que no se ha concedido a ningún otro empleado; (2) se le habilitó una oficina en el Área de Servicio para que estuviese más cómoda; (3) se le concedió turno de venta en el área de vendedores regulares, a pesar de que su plaza debía atender única y exclusivamente posibles ventas de clientes que visitaran el área de servicio para sus vehículos; entre otros beneficios.

Por otro lado, concluimos igualmente, a base de la información recopilada, que la señora Rivera Marín constantemente está creando un ambiente de desasosiego en el área de trabajo; que ha creado entre sus compañeros de trabajo, sus supervisores inmediatos y el personal administrativo de la empresa la impresión falsa de que tiene algún tipo de relación especial con el dueño de la compañía y aprovecha la misma para retar las directrices de éstos y evadir las normas administrativas de la empresa; que hace

comentarios, expresiones y observa conductas que van en contra de los mejores intereses de la empresa.

Surge, además, de la presente investigación que la señora Rivera Marín en varias ocasiones ha creado rumores falsos sobre compañeros de trabajo y la empresa; que ha incurrido en conducta de insubordinación y falta de cumplimiento a las normas de la empresa; que se dirige a los compañeros de trabajo en forma irrespetuosa y poco cordial; que no asiste a seminarios, según se le requiere por sus supervisores y/o llega tarde y no presta atención a los mismos; que contempla una actitud, según las palabras de los entrevistados, de que "puede hacer y deshacer porque es íntima del señor Vaillant"; que es indisciplinada; que le agrada indisponer a los compañeros de trabajo entre sí, creando bandos; que mantiene una actitud retante en cuanto a reglas y procedimientos del lugar de trabajo; y que intenta poner a los empleados contra la gerencia.

Lo anteriormente expuesto, a nuestro juicio, constituye base suficiente para que Triangle considere tomar las medidas disciplinarias que correspondan en cuanto a la Sra. Mayra Rivera Marín.

83. La conclusión y recomendaciones de la Lcda. Santana se basaron en la totalidad de los testimonios de las personas entrevistadas y las circunstancias evaluadas.

84. La Lcda. Santana declaró en su deposición que los rumores falsos que la querellante difundió en la empresa consistían en que los empleados utilizaban drogas y que había dos vendedores que siempre estaban endrogados.

85. El único entrevistado que alegó que ha visto vendedores drogados es el Sr. Carlos Caraballo, pero ante la pregunta de la Lcda. Santana de quiénes eran dichas personas, este no quiso contestar, limitándose a decir que "todo el mundo lo sabe", no obstante, al preguntársele quién era todo el mundo, el Sr. Caraballo tampoco quiso contestar.

86. El Sr. Frank Paonessa analizó el informe de investigación que la Lcda. Santana entregó a VPH al concluir la investigación.

87. A finales de marzo de 2021, el Sr. Frank Paonessa se reunió con la Sra. López y con el Sr. Charles Vaillant y a raíz de los hallazgos, conclusión y recomendaciones de la Lcda. Santana en el informe de investigación, el Sr. Paonessa tomó la decisión de despedir a la querellante.

88. La decisión del despido estuvo basada en los hallazgos, conclusión y recomendaciones de la investigación realizada por la Lcda. Santana, particularmente en el testimonio de todas personas entrevistadas, por las cuales se concluyó que la querellante violó sus responsabilidades y obligaciones de su puesto de trabajo de conformidad con las normas de la empresa e incurrió en conducta impropia al crear un ambiente de trabajo de desasosiego; hacer comentarios despectivos y negativos de la compañía al referirse a ella como "una mierda", lo que constituyó una falta de lealtad; hacer acusaciones maliciosas y falsas de que compañeros trabajaban drogado; y negarse a seguir los procesos internos establecidos.

89. En la decisión del despido, el Sr. Paonessa tomó en consideración el historial disciplinario de la querellante, el que cuenta con una amonestación escrita del 9 de octubre de 2020 y una suspensión de empleo y sueldo del 17 de febrero de 2021.

90. El 15 de abril de 2021, se le notificó a la querellante su despido.

91. La querellante declaró en su deposición que desconocía la fecha en que VPH tomó la decisión de despedirla.

92. La querellante desconoce los criterios que se tomaron en consideración para despedirla.

93. El señor Paonessa declaró que VPH no contrató a nadie para ocupar el puesto de VIP Rep. que ocupaba la querellante.

94. El 7 de abril de 2021, la querellante notificó a la Sra. López una queja alegando actos de acoso laboral.

95. Al momento de recibirse dicha queja, el señor Paonessa ya había tomado la decisión de despedir a la querellante.

96. La querellante alega que su suspensión del 17 de febrero de 2021 fue discriminatoria por razón de ser mujer, puesto que el Sr. González se ofendió por esta hacerle una pregunta; porque fue de manera abusiva; porque VPH debió hablar con ella antes de suspenderla y, porque no debieron suspenderla por hacerle una pregunta a un gerente.

97. La querellante alega que fue discriminada por la Sra. Tania Vidal por ser mujer, toda vez que cuando llegó de su suspensión la quitaron del departamento de llamadas CRM y de la lista de vendedora para coger clientes, para tener turno.

98. La Sra. Rivera no recuerda el nombre de ninguno de los clientes de ella que alega que la Sra. Vidal daba a otros vendedores y tampoco las fechas en que eso ocurrió.

99. El 29 de septiembre de 2020, la Sra. Vidal envió un correo electrónico al Sr. Luis Velázquez, gerente, informándole que un cliente de la Sra. Rivera había sido reasignado a otro vendedor debido a que el caso no tenía notas en el sistema desde el día anterior.

100. El 1 de marzo de 2021, a las 11:01 a.m., al llegar de la suspensión, la querellante le escribió un correo electrónico a la Sra. Vidal preguntándole por qué sus clientes fueron pasados a otros vendedores.

101. El 1 de marzo de 2021 a las 11:59 p.m., la Sra. Vidal respondió que, en efecto, al notificársele sobre la suspensión el proceso es que se desactiva del sistema de la base de datos y los clientes se resignan a otros vendedores para continuar con el seguimiento de estos; que ya la había regresado al sistema y ninguna información fue borrada.

102. Al regresar de la suspensión, la querellante fue reincorporada al sistema.

103. Cuando un empleado es suspendido, se lo dejan saber a la Sra. Vidal para identificarlo en el sistema y que los clientes se puedan reasignar a otros vendedores para que puedan continuar trabajándose.

104. A la Sra. Vidal le consta que los vendedores varones también fueron sacados del sistema de llamadas durante una suspensión.

105. Durante su suspensión, la querellante no podía realizar ventas.

106. El 22 de junio de 2020, por instrucciones del Sr. Medina, la Sra. Vidal sacó del sistema de llamadas a la querellante por esta no haber completado un adiestramiento.

107. El 22 de junio de 2020, la Sra. Vidal, por instrucciones del Sr. Medina, también sacó del sistema de llamadas al empleado John Cordero por no haber completado un adiestramiento.

108. El 25 de julio de 2020, la Sra. Vidal, por instrucciones del Sr. Ismael Medina, sacó a la querellante del sistema de rotación de llamadas por no cumplir con el libreto de llamadas.

109. El 15 de septiembre de 2020, por instrucciones del Sr. Medina, el empleado Walter Acosta fue eliminado de todos los sistemas de VPH, hasta nuevo aviso.

110. Si un vendedor no daba seguimiento adecuado a sus clientes entrando la información necesaria en el sistema al momento, ese cliente entonces sería reasignado a otro vendedor para el seguimiento adecuado.

111. El 19 de marzo de 2021, la Sra. Vidal envió un correo electrónico a los vendedores de VPH indicándoles, entre otras cosas, que toda oportunidad de hacer negocio ("Opportunity to do Business" u "OTDB") que no estuviera actualizada en el sistema, sería referida a otro vendedor.

112. La querellante alega que el Sr. González tasaba sus vehículos por debajo de sus compañeros de trabajo.

113. La querellante alega que tasaban sus vehículos por debajo de los de los varones porque "conoce muy bien su trabajo, y porque veía que, a otros compañeros, en un mismo carro similar, les daba cinco mil y seis mil dólares más". Y la diferencia es extremadamente grande.

114. Los carros que la querellante alega que el Sr. González le tasaba por debajo de los vehículos de los varones podían tener diferentes situaciones que variaran la tasación.

115. La querellante no recuerda cuáles eran las especificaciones de los vehículos de los varones que alega tasaban por encima de los asignados a ella.

116. La querellante no recuerda el modelo y año de los vehículos que alega que el Sr. González tasaba por debajo de los vehículos asignados a los varones.

117. La querellante alega que tuvo que solicitarles a varios compañeros que sometieran la información de los vehículos de la querellante para así poder lograr una mejor tasación.

118. La querellante no tiene evidencia, más allá de su testimonio, para probar que le tasaban los carros por debajo de los de los empleados varones.

119. La querellante alega que las tasaciones eran de los mismos vehículos, pero reconoce que cada caso es individual.

120. La querellante no recuerda cuáles son las características de los vehículos de sus compañeros que alega eran tasados por encima de los de ella.

121. El Sr. González es la persona encargada de hacer las valorizaciones de los vehículos que se daban en "trade-in".

122. Como gerente de vehículos nuevos, el Sr. Velázquez, tenía la inherencia de tasar vehículos cuando el gerente de vehículos usados no estaba disponible y, con relación a los precios de ventas de los vehículos, si varios vendedores le presentaban al Sr. Velázquez ofertas de clientes para la compra de un mismo vehículo, el Sr. Velázquez tenía discreción para dar la venta al vendedor que presentara la mejor oferta.

123. La valorización de carros en "trade-in" se hacía mediante un sistema conocido como VAuto, en el que se escanea el número de serie y el carro automáticamente cae a la aplicación en la que se entra el millaje, la condición y el modelo del vehículo y entonces el sistema da la valorización del valor aproximado del vehículo.

124. También se considera en la valorización del vehículo el año del vehículo, las gomas, cuántos cilindros tiene el vehículo, si tiene "sunroof", si ha tenido choques, si tiene ruidos, y si requiere de algún arreglo.

125. El proceso de valorización también incluye hacer "test drives" en caso de identificar alguna luz prendida o condición

y se lleva al Departamento de Servicio para que ahí identifiquen lo que tenga el vehículo.

126. El Sr. González determinaba los precios de los vehículos usados a base del valor del vehículo en el mercado y de la ganancia que el entendía que se le podía ganar al carro.

127. La querellante alega que fue discriminada por ser mujer ya que en un momento dado crearon un área nueva en lo que remodelaban el 'dealer' y había un solo baño y los varones de maldad orinaban el inodoro y ella lo tenía que limpiar.

128. La querellante alega que el Sr. Velázquez y el Sr. González le dijeron que "meara parada", cuando la querellante les indicó sobre la situación de la limpieza del baño.

129. En el área de servicio donde estaba la oficina de la querellante había otro baño para el que solamente tenían llave los del departamento de servicio donde estaba la oficina de la querellante. Sin embargo, la querellante nunca pidió copia de la llave, pues ella trabajaba para el área de ventas y no de servicio.

130. La querellante alega que el Sr. Velázquez discriminó en su contra por esta ser mujer y que en una ocasión este le gritó y le iba a dar.

131. La querellante no recuerda la fecha en que ocurrió el incidente en el que el Sr. Velázquez alegadamente le iba a dar.

132. La querellante no documentó por escrito el alegado incidente.

133. La querellante alega que el Sr. Velázquez y el Sr. González discriminaron en su contra por ser mujer porque cuando iba a hacer un negocio le decían que el carro llegaba en 2 semanas y el vehículo llegaba ese mismo día, impidiendo que esta pudiera realizar la venta.

134. La querellante no sabe la fecha en que el Sr. Velázquez y el Sr. González le decían que los vehículos no estaban disponibles.

135. La querellante no documentó las alegadas situaciones en las que el Sr. Velázquez y el Sr. González le decían que los vehículos no estaban disponibles y tampoco presentó una queja por dicha situación. Fundamentó su decisión de no acudir a Recursos Humanos en que quería evitar represalias y más problemas.[2]

El Tribunal de Primera Instancia dictó sentencia, mediante la cual declaró ha lugar la solicitud de sentencia sumaria presentada por la parte apelada. Específicamente, el foro de instancia razonó que no había controversia real sustancial en cuanto a algún hecho esencial y pertinente que impidiera la sentencia sumaria. Además, sostuvo que surgía de la prueba que la apelante incumplió las responsabilidades y obligaciones de su puesto, y que la apelada utilizó otros medios alternos para que esta rectificara su disciplina. Sin embargo, sostuvo que esta continuó en su patrón de conducta. Por consiguiente, concluyó que el despido estuvo

---

[2] *Sentencia*, Apéndice de la Apelación, en las págs. 667-680.

justificado y que, en cuanto al pago de mesada incompleto, la apelante no ubicó al tribunal en posición para determinar si recibió lo que le correspondía. También sostuvo que no procedía la causa de acción de represalias por que hubo ausencia de prueba sobre el nexo causal. Finalmente, el tribunal razonó que no procedía la causa de acción por discrimen por razón de sexo porque el reclamo de higiene, si bien afectaba sus condiciones de empleo, no constituyó práctica discriminatoria. Además, respecto a las tasaciones por debajo de la de los demás compañeros el Tribunal resolvió que el valor de estos dependía de múltiples factores, entre los cuales no se encontraba que la apelante fuera mujer.

Inconforme, la apelante acude ante este Tribunal de Apelaciones y señala que el Tribunal de Primera Instancia incurrió en los siguientes errores:

**Primer Error:** Erró el Honorable Tribunal de Primera Instancia, Sala de Aguada, al haber declarado Ha Lugar una Moción de Sentencia Sumaria presentada por la parte apelada a pesar de que existen hechos medulares que fueran controvertidos por la parte apelante y que están en controversia.

**Segundo Error:** Erró el Honorable Tribunal de Primera Instancia, Sala de Aguada, al haber utilizado como fundamento para su despido los halagados hallazgos y recomendaciones incluidos en un Informe preparado por la Lcda. Sonia Santana que fue notificado a sus abogados luego del despido de la apelante y que[,] como cuestión de hecho, el Sr. Frank Paonessa, Gerente General de la parte apelada, admitió bajo juramento no haberlo utilizado a la fecha del despido de la apelante.

**Tercer error:** Erró el Honorable Tribunal de Primera Instancia, Sala de Aguada, al haber desestimado sumariamente todas las alegaciones de la apelante sin haber evaluado la credibilidad de los testigos, no obstante que existen aspectos subjetivos relacionados con la credibilidad de los testigos que ambas partes se proponen presentar.

**Cuarto error:** Erró el Honorable Tribunal de Primera Instancia, Sala de Aguada, al haber desestimado sumariamente las alegaciones de la apelante relacionadas con salarios adeudados sin que se hubieran planteado las mismas en la Moción de Sentencia Sumaria presentada por la parte apelada, así como tampoco en la Sentencia emitida por el Tribunal de Primera Instancia.

Por otro lado, la parte apelada presentó su oposición mediante la cual adujo que el Tribunal de Primera Instancia no erró al dictar sentencia sumaria. Enfatizó que la apelante no presentó prueba alguna de que las decisiones de la empresa fueran motivadas por un ánimo discriminatorio.

Sostuvo que la apelante esgrimió los mismos argumentos que levantó en su oposición a la sentencia sumaria, y que, al igual que en aquella oportunidad, la apelante incumplió los requisitos de la Regla 36.3 de Procedimiento Civil, 32 LRPA Ap. V., por cuanto el foro de instancia no erró al dictar sentencia sumaria.

**II**

### A. Sentencia Sumaria

En nuestro ordenamiento jurídico el mecanismo de sentencia sumaria se rige por la Regla 36 de Procedimiento Civil de 2009, *supra*, en síntesis dispone que para poder adjudicar en los méritos una moción de sentencia sumaria se requiere que se presente "una moción fundada en declaraciones juradas o en aquella evidencia que demuestre la inexistencia de una controversia sustancial de hechos esenciales y pertinentes, para que el tribunal dicte sentencia sumariamente" ya sea sobre la totalidad de la reclamación o parte de esta.

El mecanismo procesal de la sentencia sumaria es un remedio de carácter extraordinario y discrecional. *Sucn. Maldonado v. Sucn. Maldonado*, 166 DPR 154, 184 (2005). El cual tiene como finalidad "propiciar la solución justa, rápida y económica de litigios civiles que no contengan controversias genuinas de hechos materiales". *Const. José Carro v. Mun. de Dorado*, 186 DPR 113, 128 (2012). Por ser la sentencia sumaria un remedio de carácter discrecional, "[e]l sabio discernimiento es el principio rector para su uso porque, mal utilizada, puede prestarse para despojar a un litigante de 'su día en corte', principio elemental del debido proceso de ley". (Énfasis en el original.) (Citas omitidas.) *Mgmt. Adm. Servs. Corp. v. E.L.A.,* 152 DPR 599, 611 (2000).

Siendo esto así, sólo procede que se dicte la sentencia sumaria "cuando surge de manera clara que, ante los hechos materiales no controvertidos, el promovido no puede prevalecer ante el Derecho aplicable y el Tribunal cuenta con la verdad de todos los hechos necesarios para poder resolver la controversia". *Meléndez González et al. v. M. Cuebas*,

193 DPR 100, 109-110 (2015), que cita a *Const. José Carro v. Mun. Dorado*, *supra*. De haber alguna duda acerca de la existencia de una controversia sobre los hechos medulares y sustanciales del caso deberá resolverse contra la parte que solicita la moción, haciendo necesaria la celebración de un juicio. *Rivera et al. v. Superior Pkg., Inc. et al*, 132 DPR 115,133 (1992).

Quien promueve la sentencia sumaria "debe demostrar que no existe controversia sustancial o real en cuanto a algún hecho material, es decir, en cuanto a ningún componente de la causa de acción". *Meléndez González v. M. Cuebas*, *supra*, en la pág. 110. Un hecho material "es aquel que puede afectar el resultado de la reclamación de acuerdo con el derecho sustantivo aplicable". J.A. Cuevas Segarra, *Tratado de Derecho Procesal Civil*, San Juan, Pubs. J.T.S., 2000, T. I, pág. 609. Por otra parte, quien se opone a una sentencia sumaria debe presentar contradocumentos y contradeclaraciones que contradigan los hechos incontrovertidos por parte del promovente. *Rivera et al. v. Superior Pkg., Inc. Et al.*, *supra*. Por lo cual viene obligada a contestar de forma detallada la solicitud de sentencia sumaria.  Regla 36.3(b) de Procedimiento Civil, *supra*.

Se ha pautado que "[l]os jueces no están constreñidos por los hechos o documentos evidenciarios que se aduzcan en la solicitud de sentencia sumaria" y que "[d]eben considerar todos los documentos en autos, sean o no parte de la solicitud, de los cuales surjan admisiones que hagan las partes*." Vera v. Dr. Bravo*, 161 DPR 308, 333 (2004). Sin embargo, ante un proceso de sentencia sumaria el tribunal está impedido de dirimir cuestiones de credibilidad. *Id.*

Según se ha establecido jurisprudencialmente, el tribunal apelativo se encuentra en la misma posición que el tribunal de primera instancia al determinar si procede una sentencia sumaria. Sin embargo, al revisar la determinación de primera instancia, el tribunal de apelación está limitado de dos maneras:

> 1. s[o]lo puede considerar los documentos que se presentaron ante el foro de primera instancia; y

2. el tribunal apelativo s[o]lo puede determinar si existe o no alguna controversia genuina de hechos materiales y esenciales, y si el derecho se aplicó de forma correcta. No puede adjudicar los hechos materiales esenciales en disputa. *Vera v. Dr. Bravo*, *supra*, págs. 334-335.

El deber de adjudicar hechos materiales y esenciales es una tarea que le compete al Tribunal de Primera Instancia y no al foro revisor. Por consiguiente, el Tribunal Supremo en *Meléndez González et al. v. M. Cuebas*, *supra*, estableció el estándar que debemos utilizar como tribunal revisor al momento de evaluar determinaciones del foro primario en las que se conceden o deniegan mociones de sentencia sumaria. En lo pertinente, dispuso que "[l]a revisión del Tribunal de Apelaciones es *de novo* y debe examinar el expediente de la manera más favorable hacia la parte que se opuso a la Moción de Sentencia Sumaria en el foro primario". *Id*. en la pág. 118. Además, reiteró que por estar en la misma posición que el foro primario, debemos revisar que tanto la moción de sentencia sumaria como su oposición cumplan con los requisitos de forma recopilados en la Regla 36 de Procedimiento Civil*. Id.*

Luego que culminemos nuestra revisión del expediente, de encontrar que en realidad existen hechos materiales y esenciales en controversia, debemos tener en cuenta que el foro apelativo intermedio tiene que cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil, *supra*, y debe exponer concretamente cuáles hechos materiales encontró que están controvertidos y cuáles están incontrovertidos. En lo pertinente, establece lo siguiente:

> Si en virtud de una moción presentada bajo las disposiciones de esta regla no se dicta sentencia sobre la totalidad del pleito […] y es necesario celebrar juicio, será obligatorio que el tribunal resuelva la moción mediante una determinación de los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial y los hechos esenciales y pertinentes que están realmente y de buena fe controvertidos […]". 32 LPRA Ap. V, R. 36.4.

Esta determinación puede hacerse en la Sentencia que disponga del caso y puede hacer referencia al listado de hechos incontrovertidos que emitió el foro primario en su Sentencia. *Id.* Por el contrario, de resultar que los hechos materiales y esenciales realmente están incontrovertidos,

entonces nos corresponde revisar *de novo* si el TPI aplicó correctamente el derecho a los hechos incontrovertidos. *Meléndez González et al. v. M. Cuebas*, *supra,* en la pág. 119. A su vez, la Regla 36.3(e) de Procedimiento Civil, *supra*, dispone como sigue:

> La sentencia solicitada será dictada inmediatamente si las alegaciones, deposiciones, contestaciones a interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas si las hay, u otra evidencia demuestran que no hay controversia real sustancial en cuanto a algún hecho esencial y pertinente y que como cuestión de derecho el tribunal debe dictar sentencia sumaria a favor de la parte promovente.

La sentencia sumaria sólo debe dictarse en casos claros. *Mgmt. Adm. Servs. Corp. v. E.L.A.*, *supra*, en la pág. 611. Por tanto, cuando no existe una clara certeza sobre todos los hechos materiales en la controversia, no procede una sentencia sumaria. No obstante, se ha reiterado que "[e]l solo hecho de no presentar evidencia que controvierta la presentada por la parte promovente no implica que necesariamente procede la sentencia sumaria". *PFZ Props., Inc. v. Gen. Acc. Ins. Co.*, 136 DPR 881, 913 (1994).

Al dictar una sentencia sumaria el Tribunal deberá realizar un análisis dual el cual consiste en: (1) analizar los documentos que acompañan la solicitud de sentencia sumaria y los que se incluyen con la moción en oposición, así como aquellos que obren en el expediente del tribunal; y (2) determinar si el oponente de la moción controvirtió algún hecho material y esencial, o si hay alegaciones de la demanda que no han sido controvertidas o refutadas en forma alguna por los documentos. *Vera v. Dr. Bravo*, *supra*, en la pág. 333. Una vez realizado este análisis el tribunal no dictará sentencia sumaria cuando: (1) existen hechos materiales y esenciales controvertidos; (2) hay alegaciones afirmativas en la demanda que no han sido refutadas; (3) surge de los propios documentos que se acompañan con la moción una controversia real sobre algún hecho material y esencial; o (4) como cuestión de derecho no procede*. Id*. en las págs. 333-334.

Se ha reiterado mediante una vasta jurisprudencia que el propósito principal de la sentencia sumaria "es propiciar la solución justa, rápida y económica de litigios que no reflejan controversias genuinas sobre hechos materiales, razón por la cual no ameritan la celebración de un juicio en su fondo". *Pilot Life Ins. Co. v. Crespo Martínez*, 136 DPR 624, 632 (1994). Sin embargo, hay que aclarar que aligerar la tramitación de un caso no puede soslayar el principio fundamental de alcanzar una solución justa. *García Rivera et. al. v. Enríquez*, 153 DPR 323, 337-338 (2001); *Cuadrado Lugo v. Santiago Rodríguez,* 126 DPR 272, 279 (1990). Un Tribunal "abusa de su discreción cuando actúa de forma irrazonable, parcializada o arbitraria." *Matías Lebrón v. Depto. Educación*, 172 D.P.R. 859, 875 (2007). Por tanto, corresponde al Tribunal conceder o denegar, en el ejercicio de su discreción, los remedios correspondientes de acuerdo con las circunstancias del litigio. Por último, la *Ley de Procedimiento Sumario de Reclamaciones Laborales*, Ley Núm. 2 de 17 de octubre de 1961, 32 LPRA sec. 3120, dispone que "[e]l querellado deberá hacer una sola alegación responsiva en la cual deberá incluir todas sus defensas y objeciones, entendiéndose que renuncia a todas las defensas u objeciones que no incluya en dicha alegación responsiva".

**B. Despido injustificado**

La *Ley Sobre Despidos Injustificados*, Ley Núm. 80 del 30 de mayo de 1976, 29 LPRA sec. 185a, establece que todo empleado que trabaja para un patrono mediante remuneración, contratado sin tiempo determinado, que sea despedido sin justa causa, tendrá derecho a recibir de su patrono una indemnización. El propósito de esta ley es "proteger a los empleados de actuaciones arbitrarias del patrono al disponer de remedios económicos que desalienten los despidos injustificados". *Ortiz Ortiz v. Medtronic*, 209 DPR 759, 770 (2022). Por tanto, el fin es uno social y coercitivo, pues se castiga al patrono que despide injustificadamente, y además provee una indemnización al empleado. *Jusino et als. v. Walgreens*, 155 DPR 560, 571 (2001). Es importante señalar que no hay

ninguna prohibición absoluta al despido de un empleado ya que siempre puede despedirse un empleado si existe justa causa. Sin embargo, cuando no hay justa causa, el patrono deberá indemnizar mediante el pago de la mesada. *Lugo Montalvo v. Sol Meliá Vacation*, 194 DPR 209, 230-231 (2015).

Por *justa causa*, se entiende aquel despido que no esté motivado por razones legalmente prohibidas y que no sea resultado del mero capricho del patrono, además, aquellos despidos que afecten el buen y normal funcionamiento de un establecimiento. 29 LPRA sec. 185b; Véase *León Torres v. Rivera Lebrón*, 204 DPR 20, 37 (2020). La ley expresamente contempla determinadas situaciones que se entienden como justa causa para el despido de un empleado. Entre estas se encuentran: (1) patrón de conducta impropia del empleado; (2) patrón de desempeño deficiente del empleado; (3) violación de los reglamentos de la empresa; (4) cierre total, temporero, o parcial de las operaciones de la empresa; (5) reorganización; y (6) reducción en el volumen de producción de la empresa. *Id.*

Los patronos tienen autoridad para establecer los reglamentos internos y normas de conducta en el lugar de empleo que estimen necesarios. Una vez adoptadas, los empleados están sujetos a cumplir estas reglas, siempre que sean razonables. Por tanto, las violaciones a estas normas del empleo serán *justa causa* para el despido cuando el patrono demuestre: (1) que las reglas son razonables; (2) que se le suministró copia escrita de dichas normas al empleado, y (3) que el empleado las violó en reiteradas ocasiones. *Jusino et als. v. Walgreens*, *supra*, en la pág. 573.

**C. Discrimen por razón de sexo**

La Constitución de Puerto Rico proscribe el discrimen motivado por razones de sexo. Const. P.R., Art. II, Sec. 1. En el entorno laboral, la *Ley Antidiscrimen de Puerto Rico*, Ley Núm. 100 de 30 de junio de 1959, 29 LPRA sec. 146, *et seq.*, de igual forma prohíbe el discrimen en el empleo en sus múltiples modalidades, entre las cuales se encuentra el sexo. De

esta forma, la ley establece responsabilidad civil contra los patronos que despidan, suspendan o discriminen contra un empleado respecto a su compensación, términos, categorías, condiciones o privilegios en su empleo. *Id.*

Los elementos esenciales para una causa de acción por despido discriminatorio de la Ley Núm. 100 son: que el empleado fue despedido, sin justa causa y que existe la modalidad de discrimen alegado. *Díaz Santiago v. International Textiles*, 195 DPR 862, 873 (2016). Corresponde al demandante demostrar específicamente los hechos que fundamentan su reclamo de discrimen. Eliminada la presunción de discrimen previamente contemplada por esta ley, el demandante no puede descansar en alegaciones, por lo cual de entrada debe establecer un caso de discrimen en su totalidad.  Este puede hacerlo presentando prueba de discrimen por razón de sexo al probar que: (1) que fue despedido sin justa causa y (2) que está ubicado en la modalidad de discrimen según la cual reclama. *Segarra Rivera v. International Shipping Agency, Inc.*, 208 DPR 964, 988 (2022). Así establecido, el patrono puede demostrar una explicación razonable para el despido.

### D. Represalias

La Ley Núm. 115-1991, según enmendada, mejor conocida como la *Ley de Represalias*, 29 LPRA sec. 194, *et seq.*, crea una causa específica de acción sobre daños y perjuicios contra cualquier patrono que discrimine contra algún empleado por ofrecer o intentar ofrecer información o testimonio ante algún foro legislativo, judicial o administrativo. *Rivera Prudencio v. Mun. de San Juan*, 170 DPR 149, 159 (2007). Específicamente, el artículo 2(a) de la Ley Núm. 115, 29 LPRA sec. 194a, dispone como sigue:

> Ningún patrono podrá despedir, amenazar, o discriminar contra un empleado con relación a los términos, condiciones, compensación, ubicación, beneficios o privilegios del empleo porque el empleado ofrezca o intente ofrecer, verbalmente o por escrito, cualquier testimonio, expresión o información ante un foro legislativo, administrativo o judicial en Puerto Rico, cuando dichas expresiones no sean de carácter

difamatorio ni constituyan divulgación de información privilegiada establecida por ley.

Por su parte, el artículo 2(b) dispone que "cualquier persona que alegue una violación a esta ley podrá instar una acción civil en contra del patrono dentro de tres (3) años de la fecha en que ocurrió dicha violación y solicitar se le compense por los daños reales sufridos, las angustias mentales, la restitución en el empleo, los salarios dejados de devengar, beneficios y honorarios de abogado". *Id.* Además, la ley fija que "la responsabilidad del patrono con relación a los daños y a los salarios dejados de devengar será el doble de la cuantía que se determine causó la violación a las disposiciones de dichas secciones". *Id.*

Finalmente, en lo pertinente, el articulo 2(c), *id.*, establece que el empleado debe probar la violación mediante evidencia directa o circunstancial. Sin embargo, este puede "establecer un caso prima facie de violación al demostrar que participó en una actividad protegida por esta ley y que fue subsiguientemente despedido, amenazado o discriminado en su contra de su empleo". Establecido lo anterior, le corresponde al patrono fundamentar una razón legítima y no discriminatoria para el despido. *Id.* "De alegar y fundamentar el patrono dicha razón, el empleado deberá demostrar que la razón alegada por el patrono era un mero pretexto para el despido". *Id.*

En *Rivera Menéndez v. Action Services*, 185 DPR 431, 445-446 (2012), el Tribunal Supremo destacó que es necesario que el empleado que reclama represalias establezca que participó en una actividad protegida y que luego fue despedido, lo cual establece una presunción *iuris tantum* de violación a esta protección. Por su parte, el patrono tiene la obligación de rebatir la mencionada presunción con una razón justificada que legitime el despido. Entonces, el empleado podrá prevalecer en su reclamo de represalias si demuestra que la razón alegada por el patrono es un simple pretexto para el despido discriminatorio. *Feliciano Martes v. Sheraton*, 182 DPR 368, 393-394 (2011). Por otro lado, el empleado puede demostrar la violación de manera directa, mediante evidencia directa o

circunstancial que demuestre el nexo casual entre la conducta del demandado y el daño sufrido. *Rivera Menéndez v. Action Service*, *supra*.

**III**

La apelante señaló que el Tribunal de Primera Instancia erró al dictar sentencia sumaria ignorando los hechos materiales en controversia. Primero, argumentó que de la moción de sentencia sumaria de la parte apelada surgen hechos medulares que fueron controvertidos. Segundo, sostuvo que erró el foro primario al descansar en el informe preparado por la Lcda. Santana cuando este no le fue notificado a sus abogados y que el gerente general de la empresa admitió bajo juramento que no lo utilizó al momento del despido. Tercero, sostuvo que el Tribunal de Primera Instancia erró al dictar sentencia sumaria sin haber evaluado la credibilidad de los testigos. Finalmente, argumentó que el foro de instancia no debió desestimar su reclamo de salarios adeudados puesto que la moción de sentencia sumaria adjudicada no planteó nada al respecto.

Luego de hacer una revisión de *novo*, al examinar el expediente ante este Tribunal, se hacen formar parte de la presente Sentencia las determinaciones de hechos incontrovertidos dictados por el foro de instancia, puesto que la adjudicación de las causas presentadas en el caso de autos tan solo requiere la aplicación del derecho a los hechos. Entiéndase, que no se encuentra controversia sobre los hechos acontecidos entre las partes. Veamos.

En primer lugar, la apelante sostiene que hay controversia sobre los siguientes hechos: 7, 8, 20, 24, 38, 42, 46, 48a, 49, 50, 52, 53, 55, 58, 72, 73a, b, d, 74, 75, 76, 77, 78, 79, 80, 81, 82, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 96, 97, 98, 101, 102, 103, 105, 107, 109, 115, 116, 117, 128, 130, 135. Sin embargo, la parte apelada sostuvo que la apelante incumplió los requisitos dispuestos por la Regla 36.3 de Procedimiento Civil, *supra*, por cuanto el Tribunal de Primera Instancia no incurrió en este primer señalamiento de error. En esencia, sostuvo que esta no enumeró ni incluyó referencia a los párrafos o páginas de las declaraciones juradas u otra

prueba en la que fundamente su posición de que existían controversias de hecho.

Mediante las determinaciones número #7 y #8, el Tribunal de Primera Instancia estableció que la Sra. López como asesora de Recursos Humanos para VPH, esta les advierte sobre lo que es recomendable para hacer, sin embargo, el encargado de la decisión es el gerente. Además, la Sra. López forma parte del proceso de intervención, pero no toma la decisión de despedir empleados. La apelante sostiene que estos dos hechos se encuentran en controversia a la luz de lo declarado por ella, bajo juramento durante su deposición. Precisamente, sostiene que expresó que no hace recomendaciones sobre acciones disciplinarias.

Según surge de la deposición citada por la apelante, la Sra. López declaró que no brinda recomendaciones sobre acciones disciplinarias, que esta evalúa las situaciones y le advierte al gerente, quien es el encargado de tomar la decisión sobre la acción disciplinaria.[3] Por consiguiente, no erró el Tribunal de Primera Instancia al incluir estas determinaciones de hecho debido a que la testigo describió específicamente su rol; entiéndase que esta asesoró pero no intervino en la toma de decisiones sobre acciones disciplinarias.

Por otro lado, la apelante sostiene que hay controversia sobre los hechos #48 y #50 de la moción de sentencia sumaria. Por medio de estos, la parte apelada sostuvo que no hay controversia respecto al contenido del correo electrónico en el que el Sr. González expresó lo siguiente:

> 48. En el referido correo electrónico, el Sr. González expresa que la Sra. Rivera:
> a. No sigue los procesos de la empresa.
> b. No asiste a reuniones diarias de ventas y al preguntarle por qué no va a las reuniones, ésta le expresa: "Yo nunca voy porque le pregunto a los muchachos y ellos me dicen que siempre están hablando de [lo] mismo".
> c. No llega a tiempo en su horario de entrada.
> d. No asistió a una reunión de Dealer Socket y de llamadas que el Sr. González coordinó con la Sra. Vidal el 5 de febrero.
> e. Llegó tarde a la reunión de ventas del 8 de febrero y, cuando llegó, se mantuvo hablando o texteando sin prestar atención.

---

[3] Apéndice de la apelación, *Deposición de la Sra. Myrna López Ginorio*, en la pág. 568.

f. Crea un ambiente tóxico en el Departamento de Ventas y le preocupa que ella entienda que no tiene supervisor y que puede hacer lo que le da la gana.

g. Hace comentarios negativos de la gerencia del Dealer.

50. El Sr. González también le indicó al Sr. Medina que ese día le preguntó a la querellante por un cliente para buscarlo en Dealer Socket y la querellante no había entrado la información en el sistema; que ese día la querellante tampoco asistió a la reunión de la mañana y que su forma de trabajar no se ajusta a los procesos de la empresa.

Conforme surge del correo electrónico anejado, efectivamente este fue enviado en la fecha indicada y contiene la información sugerida por la parte apelada.[4] Por otro lado, surge de otro correo electrónico que el Sr. González le informó al Sr. Medina lo acontecido respecto al hecho propuesto #50.[5] Sobre este particular la apelante incumplió los requisitos establecidos por la Regla 36.3(b)(2) para oponerse a una moción de sentencia sumaria, entiéndase hacer referencia a prueba que establezca la existencia de controversias de hechos sobre el particular. Su oposición se limitó a argumentar en contrario mediante generalidades, entre estas que el Sr. González admitió bajo juramento que no recordaba las fechas en que esta se ausentó a las reuniones y que no recordaba si se tomó alguna medida disciplinaria en contra de esta por el incidente. Con respecto a estos hechos, tampoco procede el señalamiento de error.

La parte apelante sostiene que se encuentran en controversia los hechos #49, #52, #53 y #55 propuestos en la moción de sentencia sumaria, como sigue:

49. El 16 de febrero de 2021, el Sr. González presentó una queja escrita al Sr. Ismael Medina indicándole que, en presencia de otro empleado, la querellante le preguntó si estaba molesto y que, aunque el Sr. González le dijo que no, la querellante le indicó que ella nota cuando el se molesta porque se pone "colorado".

52. El Sr. González se quejó por escrito por encontrar que fue una falta de respeto el contexto y con la actitud en que la querellante le dijo que se ponía "colorao" cuando se molestaba y la manera en que le estaba hablando.

53. El Sr. Ismael Medina le consultó a la Sra. López sobre la queja del Sr. González y esta recomendó que se le impartiera

---

[4] *Id.*, *Correo Electrónico – Anejo 19*, en la pág. 386.
[5] *Id.*, *Correo Electrónico – Anejo 21*, en la pág. 434.

una suspensión a la querellante por incurrir en falta de respeto y no seguir los procesos y normas de la empresa.

55. El 17 de febrero de 2021, la querellante fue suspendida de empleo y sueldo por concluirse que ésta le faltó el respeto al Gerente, Sr. Jesús González y por no seguir los procesos de la compañía.

La apelante arguye que, durante su deposición, el Sr. González reconoció que la expresión de estar *colorao* no era una falta de respeto. Sin embargo, según surge de su propia declaración este expresó que dicha frase fue ofensiva por el contexto en que se dio y no por la palabra en sí.[6] Por consiguiente, la apelante no tiene razón al señalar que este testigo se contradijo. No están en controversia los hechos que sugirió la parte apelada en su moción de sentencia sumaria.

Por otra parte, la apelante sostiene que se encuentra en controversia el hecho incontrovertido #58, propuesto en la moción de sentencia sumaria, el cual expresaba lo siguiente:

58. Durante su suspensión, al Sr. Carlos Caraballo lo sacaron del sistema ya que no podía realizar llamadas a clientes durante la suspensión.

En esencia, sostuvo que este hecho consiste una declaración exparte *self serving* que contradice lo declarado bajo juramento por el testigo Sr. Frank Paonessa Cuevas mediante la contestación a interrogatorio. Precisamente sostuvo que este testigo no mencionó en absoluto al Sr. Caraballo en la contestación al interrogatorio. La apelante argumenta que la pregunta siete del interrogatorio debió haber mencionado que habían suspendido al Sr. Caraballo. Sin embargo, estudiado el interrogatorio incluido en el expediente, mediante este requerimiento número siete solo se le exigió a la apelada que "suministre el nombre, la dirección y el número de teléfono del (los) testigo(s) que se propone(n) utilizar en la vista en su fondo de este caso.[7] La parte apelada contestó dicho requerimiento al indicar que al momento no tenía una determinación final sobre la prueba testifical que presentaría durante la vista en su fondo,

---

[6] *Id.*, *Deposición del Sr. Jesús González Rodríguez*, en las págs. 571-572.
[7] *Id.*, *Contestación a Interrogatorio y Producción de Documentos*, en la pág. 616.

pero anunció que podría anunciar como testigos a la Sra. Myrna López y a la Lcda. Sonia Santana. Este hecho no quedó impugnado mediante la contestación al interrogatorio, por lo cual no hay controversia sobre este.

De forma similar ocurre con los hechos incontrovertidos #91, #92, #93 y 94, propuestos en la moción de sentencia sumaria, los cuales la apelante sostiene que están en controversia. Estos consisten en:

> 91. El Sr. Frank Paonessa analizó el Informe de Investigación que la Lcda. Santana entregó a VPH al concluir la investigación.
> 92. A finales de marzo de 2021, el Sr. Frank Paonessa se reunió con la Sra. López y con el Sr. Charles Vaillant y a raíz de los hallazgos, conclusión y recomendaciones de la Lcda. Santana en el Informe de Investigación, el Sr. Paonessa tomó la decisión de despedir a la querellante.
> 93. La decisión del despido estuvo basada en los hallazgos, conclusión y recomendaciones de la investigación realizada por la Lcda. Santana, particularmente en el testimonio de todas personas entrevistadas, de los que se concluyó que la querellante violó sus responsabilidades y obligaciones de su puesto de trabajo de conformidad con las normas de la empresa e incurrió en conducta impropia al crear un ambiente de trabajo de desasosiego; hacer comentarios despectivos y negativos de la Compañía al referirse a ella como "una mierda", lo que constituyó una falta de lealtad; hacer acusaciones maliciosas y falsas de que compañeros trabajaban drogado; y negarse a seguir los procesos internos establecidos.
> 94. En la decisión del despido, el Sr. Paonessa tomó en consideración el historial disciplinario de la querellante, el que cuenta con una amonestación escrita el 9 de octubre de 2020 y una suspensión de empleo y sueldo del 17 de febrero de 2021.

La apelante señala que estos hechos surgen de una declaración jurada *self serving*, en contradicción a la contestación juramentada al interrogatorio cursado durante el descubrimiento de prueba. Particularmente, que en su contestación al interrogatorio no hizo referencia al informe de la Lcda. Santana sobre el momento en que decidió despedir a la apelante. Asimismo, apuntó a que el testigo declaró que tomó en consideración el historial disciplinario de la apelante al momento de decidir el despido, pero en el interrogatorio cursado no proveyó evidencia correspondiente a las personas que tomaron la decisión de despedir a la apelante.

Sobre estos, la apelante tampoco tiene razón. Examinado el interrogatorio y el contenido de la declaración jurada en cuestión,

concluimos que estas no son incongruentes. Por el contrario, mediante la declaración jurada la parte apelada brindó y aportó más información compatible a lo provisto en el descubrimiento.[8] Entiéndase, la apelada indicó quienes fueron responsables de la decisión del despido y,[9] mediante la declaración jurada, el testigo sostuvo que tomó en consideración el informe preparado por la Lcda. Santana. Por consiguiente, debido a que la declaración jurada es consistente, no hay controversia de hechos al respecto.

Además, la apelante impugnó los hechos incontrovertidos #20, #24, #38, #39, #40, #41, #42, #43, #44, #45, #46 del dictamen recurrido los cuales consistían en que:

20. La Sra. Vidal daba seguimiento a la querellante y al grupo de vendedores sobre aspectos y adiestramientos de los sistemas de ventas de la empresa, incluyendo adiestramiento sobre Dealer Socket.

24. Como gerente, la Sra. Vidal era responsable de, entre otras cosas, supervisar que la querellante y representantes de ventas cumplieran con entrar la información de los clientes en el CRM, que realizaran las llamadas de seguimiento a los clientes y darles seguimiento cuando identificaba que no se estaba siguiendo algún proceso.

38. El 15 de septiembre de 2020, a las 2:27 p.m., la Sra. Vidal le envió un correo electrónico a la querellante orientándola sobre el proceso correcto al atender llamadas de clientes y le indicó que en una llamada se escucha que tuvo 2 interrupciones y que eso hace que el cliente se sienta que no se respeta su tiempo.

39. El 15 de septiembre de 2020 a las 5:11 p.m., la Sra. Vidal le envió al Sr. Paonessa un correo electrónico indicándole lo siguiente:

Necesito hablar con usted sobre una llamada que me hiciera la Sra. Mayra Rivera indicando que se siente que ha sido de una forma ofensiva. La manera que me habló fue en un tono muy retante y no me sentí cómoda. Este es el trabajo que me corresponde como supervisora de BDC y CRM y le envoi (sic) correos a todos los Vendedores. Me habló en un tono tan inaceptable que se escuchó en la oficina. Me dijo que lo llevaría al foro correspondiente y mi sugerencia fue reunirnos los tres. Aún así me dijo que no que ella sería quien lo haría porque yo no tengo que estar en la reunión. De igual manera, aún así le expliqué que no es mi intención que se sintiera así y que es mi rutina enviar los correos para mejorar el Sistema.

---

[8] *Id.*, *Declaración Jurada – Frank Paonessa Cuevas*, en las págs. 219-280.
[9] *Id.*, *Contestación a Interrogatorio y Producción de Documentos*, en la pág. 619.

40. El 17 de septiembre de 2020, la Sra. Vidal le envió al Sr. Frank Paonessa un correo electrónico indicándole que, el 22 de junio de 2022, había referido al Sr. Medina el audio de una llamada en que la querellante le habló a un cliente con una palabra despectiva al explicarle lo que era un "Sack pack", y que la decisión del Sr. Medina fue que hasta que no terminara los adiestramientos de Chrysler no podía recibir llamadas de venta.

41. El 5 de octubre de 2020, la Sra. Vidal le envió un correo electrónico al Sr. Paonessa indicándole:

Hoy nuevamente recibí llamada de la Sra. Mayra Rivera indicando que siente que tengo algo personal en su contra. Me reclamó esta llamada que reasigné luego de discutirla con usted y enviársela a Luis Velázquez. Me indica que no siempre puede hacer las notas al momento porque a ella le pagan por vender. Además, me reclamó que a ella fue a la única persona que se le sacó de recibir llamadas luego de que la decisión tomada por el Sr. Ismael Medina fuera por una llamada en la que ella le dice al cliente "que era un Scat Pack utilizando una palabra fuera de lugar. Indica que se siente deprimida y que interesa reunirse con usted y conmigo al respecto. Entiendo que he sido respetuosa y justa al momento de tomar decisiones y es mi deber rescatar las llamadas que no se trabajan adecuadamente tal y como lo hago con todos los ejecutivos de venta. Le indiqué que si necesitaba algo que me lo enviara por escrito.

42. El Sr. Paonessa le consultó a la Sra. López sobre la conducta de la querellante en sus llamadas a la Sra. Vidal y ésta recomendó, y el Sr. Paonessa estuvo de acuerdo, que se le impartiera a la querellante una amonestación escrita ya que ese tipo de conducta no está permitida.

43. El 9 de octubre de 2020, luego de discutir la situación con la Sra. López, el Sr. Paonessa se reunió con la querellante y le impartió la amonestación escrita por su conducta hacia la Sra. Vidal, según se desprende de los correos electrónicos del 15 de septiembre y 5 de octubre de 2020.

44. El 8 de febrero de 2021, la Sra. Vidal le envió un correo electrónico al Sr. Charles Vaillant, Presidente, indicándole que estuvo visitando la tienda de Mayagüez para darle seguimiento a la utilización del CRM y que, a pesar de haberse citado a un adiestramiento el 5 de febrero, la querellante no se presentó.

45. La Sra. Vidal le indicó al Sr. Vaillant que todos saben que es de suma importancia y parte de los requerimientos de la Compañía estar en las reuniones propuestas por los gerenciales y los adiestramientos para ser más efectivos con los resultados.

En esencia la apelante sostiene que la deposición de la Sra. Tania Vidal, en la que estos se fundamentaron, es improcedente e inadmisible puesto que la contestación a la querella estaba limitada a la información levantada y conocida por el patrono a la fecha del despido conforme a *Srio.*

*del Trabajo v. J.C. Penney Co., Inc.,* 119 DPR 660 (1978). A su vez, sostiene que esta declaración jurada pretendió alterar lo declarado durante su deposición. Por lo cual, sostiene que la declaración jurada es inadmisible a la luz de la doctrina de *sham affidavit*.

En *Srio. del Trabajo v. J.C. Penney Co., Inc.*, *supra*, a la pág. 668, el Tribunal Supremo resolvió que el patrono querellado conforme a la Ley Núm. 2 viene obligado a incluir en la contestación a la querella todas sus defensas y objeciones, entendiéndose renunciadas las que no incluyó. Por lo cual no deben permitirse enmiendas a la contestación a la querella a menos que se trate de situaciones donde la enmienda interesada tenga el propósito de aclarar o ampliar una defensa afirmativa interpuesta. *Id.* a la pág. 669. En este caso no procede la aplicación de esta jurisprudencia puesto que la declaración jurada impugnada no pretende adicionar defensas afirmativas que debieron levantarse en la contestación a la querella.

Por otro lado, en cuanto a la aplicación de la doctrina de *sham affidavit*, esta procede cuando la contradicción entre lo declarado en deposición y mediante declaración jurada es claramente incompatible. *SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414, 440 (2013). La apelante aduce que la testigo se contradijo al declarar que no contactó a Recursos Humanos ni a nadie respecto a la comunicación del 15 de septiembre de 2020. Sin embargo, en su declaración jurada mencionó que le envió un correo electrónico al Sr. Paonessa en esa misma fecha.[10] Nuevamente, la apelante no tiene razón. Según surge de la transcripción de la deposición, esta declaró que le envió el referido correo electrónico.[11] Por consiguiente, no existe contradicción entre la declaración jurada y lo declarado durante la deposición.

Asimismo, la apelante sostiene que se encuentran en controversia los hechos 72 y 73(d) de la moción de sentencia sumaria, los cuales son:

---

[10] *Id.*, *Declaración Jurada – Tania Vidal Pagán*, en la pág. 363.
[11] *Id.*, en la pág. 360.

72. Con relación al testimonio del Sr. Luis Velázquez durante la investigación, surge lo siguiente del Informe de la Lcda. Santana:

a. "En relación a la Sra. Mayra Rivera manifestó que no tiene criterios para hablar bien o mal de ella, pero que ésta tuvo situación personal sobre contestaciones inadecuadas el 25 de septiembre de 2020, por lo que ese día remitió un mensaje al señor Ismael Medina. El referido mensaje lee como sigue: 'Ismael te comento que en la tarde la vendedora Mayra le esta vendiendo a la gritter un auto de la que eran de servicio compass, que no tengo ningún problema, a la vendedora le pido la llave del vehículo por que se quedó con Ella y tenía otro cliente que quería verla y le comente y me salió con malas crianzas que no le voy a aceptar. Ningún vendedor tiene el derecho de aguantar llaves para nadie.' (no se han corregido errores gramaticales)."

b. "Expresa que trata de evitarla para no tener enfrentamientos, pero le consta que no le gusta seguir instrucciones y le gusta contaminar a los compañeros para ponerlos contra la gerencia."

c. "Añade el señor Velázquez que a pesar de que la señora Rivera trabaja en ventas en el área de servicio, se le brinda la oportunidad de estar en el turno de ventas general, ya que ella se quejaba y quería estar en los dos lados."

d. "Opina el entrevistado que la señora Rivera no es persona en la que se pueda confiar; que no comparece a las reuniones; que no se deja supervisar; que cualquier situación que tiene en lugar de llevarla donde él, la lleva al Sr. Dennis González, Gerente de Nissan."

73. Con relación al testimonio del Sr. Ismael Medina durante la investigación, surge lo siguiente del Informe de la Lcda. Santana:

[…]

d. "En cuanto a los alegados altercados entre gerentes mencionados por la señora Rivera al señor Vaillant, informa el entrevistado que hubo discusión fuerte entre dos gerentes: Luis Velázquez y Hanz Vázquez hace aproximadamente seis (6) o siete (7) meses que no había clientes presentes y que ambos fueron amonestados por escrito por él. Aparte de lo anterior, no tiene conocimiento de que haya habido algún incidente entre gerentes que amerite amonestación u otra acción administrativa."

Principalmente, la apelante sostiene que estos hechos están en controversia por que la credibilidad del Sr. Luis Velázquez quedó minada tras la presentación de una demanda de despido injustificado que presentara el testigo. Examinado el expediente ante nuestra consideración, determinamos que los hechos incontrovertidos sugeridos mediante la moción de sentencia sumaria no se encuentran en controversia. Estos son

hechos que surgen de la investigación de la Lcda. Santana y que fueron recogidos mediante el referido informe.[12] Si bien este testigo tuvo un pleito contra la parte apelada, esto no altera lo declarado por este durante su deposición,[13] así como lo expresado durante la investigación que realizó la empresa. Por consiguiente, la apelante no logró demostrar controversia real de hechos sobre estos.

De igual forma, la apelante sostiene que hay controversia sobre los hechos #73(a), #73(b), #74, #75, #76, #77, #78, #79, #80, #81, #82, #84, #85, #86, #87, #88, #89 y #90. Al respecto, la apelante adujo que estos eran improcedentes puesto que se fundamentaron en el informe de la Lcda. Santana, el cual sostiene que es inadmisible. Además, apunta que ocurre lo mismo con los testimonios de Ismael Medina, Hanz Vázquez, Tomás Rosa, Isamar Pérez, Elvin Ojeda, Alberto Pérez, Emmanuel Ramírez, Christian Rojas, Pamela Ruiz y Dennis Gonzáles. Asimismo, impugnó que son inadmisibles las recomendaciones de la Lcda. Santana. Respecto a estos, por estos estar relacionados al segundo señalamiento de error los atenderemos más adelante.

La apelante impugnó los hechos incontrovertidos #96, #97 y #98 propuestos en la moción de sentencia sumaria, los cuales leen como sigue:

> 96. Aunque la decisión de despedir a la querellante fue tomada a finales de marzo de 2021, el despido le fue notificado el 15 de abril de 2021, toda vez que la decisión coincidió con el receso de Semana Santa.
>
> 97. La querellante no sabe la fecha en que VPH tomó la decisión de despedirla.
>
> 98. La querellante no sabe los criterios que se tomaron en consideración para despedirla.

En esencia, esta sostiene que en la contestación veinte al interrogatorio, la parte apelada no indicó nada al respecto. Mediante este interrogatorio le solicitó que indicara "que persona(s), así como las posiciones que estas ocupaban en la empresa querellada, intervinieron en la decisión de despedir a la querellante, intervinieron en la decisión de

---

[12] *Id.*, *Informe*, en las pág. 160-162.
[13] *Id.*, *Deposición de Luis Porfirio Velázquez Torres*, en las págs. 313, 318-320.

despedir a la querellante. Sobre esta(s) intervención(es), relacione y provea copia de la evidencia acreditativa correspondiente".[14] De la faz de este requerimiento, surge meridianamente que lo solicitado era relacionado a las personas envueltas en la toma de la decisión. Además, los involucrados en el despido declararon respecto a la fecha del despido.[15] Asimismo, la propia apelante declaró respecto a los hechos #97 y #98.[16] Por tanto, tampoco se encuentra en controversia este hecho.

Del mismo modo, la apelante sostiene que hay controversias sobre el hecho incontrovertido #101 propuesto en la moción de sentencia sumaria, que lee como sigue:

> 101. Al momento de recibirse dicha queja, VPH ya había tomado la decisión de despedir a la querellante.

Particularmente, su contención consiste en que la parte apelada no alegó nada sobre este particular al radicar su contestación a la querella. Como tal, esta sostiene que la apelada está impedida de incluir aquello que no alegó en su alegación, puesto que la ley solo contempla una alegación única. Según previamente explicamos, este hecho incontrovertido no constituye una defensa u objeción que debía ser incluida en la contestación a la querella. En este caso, la parte apelada contestó la querella al indicar que esta fue despedida justificadamente el 15 de abril de 2021.[17] El hecho impugnado no constituye una defensa nueva, sino que es acorde a lo alegado por la parte apelada en su contestación. Por consiguiente, no se encuentra controversia de hechos sobre este.

La apelante sostiene que existe controversia respecto a los hechos incontrovertidos #102 y al #103 propuestos en la moción de sentencia sumaria, que leen como sigue:

> 102. La querellante alega que su suspensión del 17 de febrero de 2021 fue discriminatoria por razón de ser mujer porque el Sr. González se ofendió por ésta hacerle una pregunta, porque fue de manera abusiva y porque VPH debió hablar con ella antes de suspenderla y porque no debieron suspenderla por hacerle una pregunta a un gerente.

---

[14] *Id.*, Contestación a *Interrogatorio y Producción de Documentos*, en la pág. 619.
[15] *Id.* en la págs. 274, 279 y 280.
[16] *Id.*, *Deposición - Mayra Rivera Marín*, en las págs. 245 y 250.
[17] *Id.*, *Contestación a Querella*, en la pág. 37.

103. La querellante alega que fue discriminada por ser mujer por la Sra. Tania Vidal porque cuando llegó de su suspensión la quitaron de departamento de llamadas CRM y de la lista de vendedora para coger clientes, para tener turno.

No existe controversia de hecho sobre este particular. En esencia, la apelante aduce que se controvirtió este hecho debido a que la querellante declaró que al regresar a su trabajo luego de la suspensión, se encontró con acoso laboral, con que discriminaban y que hubo represalias en su contra por haber enviado una carta. Además, de que la removieron del sistema y le quitaron sus clientes cuando eso no había ocurrido nunca. Sin embargo, este hecho quedó fundamentado por sus contestaciones durante la deposición.[18] En consecuencia, siendo estas fundamentadas en declaraciones de la propia apelante, estos no se encuentran en controversia.

La apelante argumenta que se encuentra en controversia el hecho #105, propuesto en la moción de sentencia sumaria, el cual lee como sigue:

105. El 29 de septiembre de 2020, la Sra. Vidal le envió un correo electrónico al Sr. Luis Velázquez, Gerente, informándole que un cliente de la Sra. Rivera había sido reasignado a otro vendedor debido a que el caso no tenía notas en el sistema desde el día anterior.

Esta determinación de hechos está bien fundamentada por la declaración jurada de la parte apelada y el referido correo electrónico anejado.[19] La parte apelada sostiene que esta no fue copiada al correo electrónico, lo cual es impertinente para sostener el hecho impugnado. Por consiguiente, no hay controversia sobre este.

El hecho incontrovertido #107, propuesto en la moción de sentencia sumaria e impugnado por la apelante, indica lo siguiente:

107. El 1 de marzo de 2021 a las 11:59 p.m., la Sra. Vidal respondió que, en efecto, al notificársele sobre la suspensión el proceso es que se desactiva del sistema de la base de datos y los clientes se resignan a otros vendedores para continuar con el seguimiento de estos y que ya la había regresado al sistema y ninguna información fue borrada.

---

[18] *Id.*, *Deposición – Mayra Rivera Marín*, en las págs. 216-219; 209-210; 240-242.
[19] *Id.*, *Declaración Jurada – Tania Vidal Pagán*, en la pág. 364, *Correo Electrónico*, en la pág. 444.

Precisamente la apelante sostiene que la Sra. Tania Vidal declaró que no había visto la comunicación de la querellante, por lo cual era imposible que contestara una comunicación que no había visto. Sin embargo, esta no citó referencia alguna al respecto. Examinado el expediente ante nuestra consideración, concluimos que tanto la testigo Vidal como la propia querellante reconocieron que el correo electrónico en cuestión se envió y además se anejó copia de este.[20] Por tanto, no hay controversia de hecho que impida la aplicación de la sentencia sumaria.

Por otro lado, la apelante sostiene que hay disputa sobre el hecho incontrovertido #109, propuesto en la moción de sentencia sumaria, el cual lee como sigue:

> 109. Cuando un empleado es suspendido, se lo dejan saber a la Sra. Vidal para identificarlo en el sistema y que los clientes se pudieran reasignar a otros vendedores para que pudieran continuar trabajándose.

Específicamente la apelante afirma que la Sra. Vidal aceptó que no existe ningún protocolo o proceso establecido para desactivar a un empleado que estuviera suspendido. Examinada la transcripción de la deposición de la Sra. Vidal, surge claramente que esta declaró sobre el proceso que esta ejecuta tras la suspensión de algún empleado. Precisamente, la transcripción refleja lo siguiente:

> P. ¿No existía ningún proceso?
> R. "Mi proceso es escalarlo al Gerente General para que entonces, me diga… me diga exactamente qué es lo que él interesa, o sea, es de acuerdo al proceso. Se suspende la persona. Yo voy directamente donde el Gerente General y entonces, él me deja saber qué es lo que se va a hacer con la persona suspendida.
> P. Okey, O sea, ¿qué el proceso era lo que le dijera el Gerente General?
> R. Mi proceso es escalarlo para saber qué vamos a hacer con clientes del sistema.
> P. Okey. ¿El Gerente General le dije… le dijo a usted que la desactivara?
> R. Me dijo que de la… que la desactivara para que entonces no pudiera contestar las llamadas y…
> P. Okey.
> R. …de paso esos clientes que se quedan sin trabajar se pudieran trabajar con otros Ejecutivos de Ventas.[21]

---

[20] *Id.*, *Correo* Electrónico, en la pág. 446, *Deposición – Mayra Rivera Marín*, en la pág. 212, *Deposición – Tania Vidal Pagán*, en la pág. 349.
[21] *Id.*, en la pág. 624.

Por consiguiente, no existe controversia sobre la función de la testigo tras la suspensión de un empleado, entiéndase que esta se comunica con su superior para reasignar los clientes a otros vendedores para continuar el servicio. De igual forma ocurre con su impugnación a los hechos incontrovertidos #116 y #117. La testigo declaró sobre el proceso que seguía en este tipo de situaciones y la apelada anejó un correo electrónico en el que se expuso que esa era la norma de la empresa.[22] Además, la apelante sostiene que este correo electrónico no le fue notificado. Sin embargo, la notificación de este correo es impertinente puesto que el hecho incontrovertido consiste en que esta era la norma de la empresa y en nada se relaciona a la notificación de este.

Finalmente, la apelante asevera que existe controversia sobre el hecho incontrovertido #135, propuesto en la moción de sentencia sumaria, que se cita a continuación:

> 135. En el área de servicio donde estaba la oficina de la querellante había otro baño para el que solamente tenían llave los del departamento de servicio donde estaba la oficina de la querellante.

La apelante argumenta que no tenía acceso al baño debido a que se requería una llave para acceder. Según surge de la transcripción de su deposición, esta declaró lo siguiente:

> P. Y en el área de servicio.
> R. En el área de servicio había, pero para ese entonces estaban cerrados con llave y solamente tenían llave los del departamento como tal de servicio. Yo trabajo como ejecutiva de ventas, y yo no tenía ese acceso.
> P. ¿Usted lo pidió en algún momento el acceso?
> R. Eh, la… Había que sacarle copia a la llave.
> P. Por eso. Entonces, ¿lo podía hacer sacándole copia a la llave?
> R. Sí. Pero es que yo no pertenezco a ese departamento, yo trabajo para ventas.
> P. Y tenía una oficina en el área de servicio. ¿Correcto?
> R. Y tenía una oficina en el área de servicio. Que nunca estaba, porque siempre estaba haciendo trabajo de ventas.[23]

Por lo cual, esta reconoció que tenía acceso a un baño próximo al departamento en el que ubicaba su oficina. Sin lugar a duda, se sostiene el

---

[22] *Id.*, *Correo Electrónico*, en la pág. 453, *Declaración Jurada -Tania Vidal Pagán*, en la pág. 365.
[23] *Id.*, *Deposición – Mayra Rivera Marín*, en las págs. 237-238.

hecho impugnado, no hay controversia sobre este puesto que así lo declaró la propia apelante durante su deposición.

Por los fundamentos anteriores, resolvemos que el Tribunal de Primera Instancia no erró al dictar sentencia sumaria debido a que no hay hechos medulares del caso en controversia. En consecuencia, correctamente procedía la desestimación de la causa de despido injustificado puesto que la apelada logró demostrar mediante prueba fehaciente que el despido tuvo una razón legítima. Además, procedía la desestimación del reclamo de represalias puesto que la empresa logró demostrar que condujo una investigación y tomo la decisión del despido previo a la presentación de la queja de la apelante. Asimismo, procedía la desestimación del reclamo de discrimen por razón de sexo exclusivamente en cuanto a los hechos relacionados a la limpieza del baño y el trato desigual en cuanto a la valoración de los vehículos *trade in*.

En su segundo señalamiento de error, la apelante afirma que erró el Tribunal de Primera Instancia al utilizar como fundamento para el despido los hallazgos y recomendaciones incluidos en el informe de la Lcda. Santana. Su contención consiste en que alega que este le fue notificado a sus abogados luego del despido, entiéndase que este fue realizado el 18 de marzo del 2021, momento en que esta todavía era empleada de la empresa. La apelante sostiene que a la luz de *Srio. del Trabajo v. J.C. Penney Co., Inc.*, *supra*, el informe es inadmisible puesto que no fue incluido en la contestación a la querella, presentada por la parte apelada.

Examinado el expediente ante nuestra consideración, especialmente la contestación a la querella y el referido informe, concluimos que mediante este último la parte apelada no enmendó sus alegaciones. Entiéndase que mediante este informe no añadió defensas afirmativas u objeciones adicionales que no estuvieran contempladas por aquellas presentadas en su contestación a la querella. Por consiguiente, la inclusión de este informe no está vedada por la Ley Núm. 2 ni su jurisprudencia interpretativa.

Respecto a la impugnación de la apelante sobre el contenido del informe, sostiene que este contiene deficiencias e incongruencias. Primero, la apelante asegura que la Lcda. Santana debió revisar el expediente de personal de la querellante. Por su parte, la licenciada declaró que no era necesario ni pertinente porque estaba investigando una queja en contra de la empresa y esto no tenía que ver con la querellante en sí. Sobre esta impugnación, concluimos que, si bien hubiera fortalecido el informe, es un hecho que este no era objeto de investigación. Segundo, la apelante impugnó que la Lcda. Santana no consultara el protocolo interno para este tipo de quejas presentadas en contra de la empresa. Precisamente, el protocolo de la empresa fue contratar a la licenciada para que esta realizara la investigación. Por consiguiente, era impertinente que esta indagara sobre protocolos de la empresa. Tercero, la apelante impugna que esta únicamente entrevistó a otros empleados que proveyó la parte apelada. Si bien es cierto, la parte apelante no señaló la existencia de otros testigos que la Lcda. Santana debió haber incluido en su informe de investigación. De igual forma, la apelante señala como incongruencia que la licenciada realizara dieciséis entrevistas en un día, sin embargo, no proveyó evidencia alguna en su contra para impugnar la validez de sus hallazgos a la luz de estas entrevistas.

Cuarto, la apelante impugnó que la Lcda. Santana no solicitara copia de documentos que sostuvieran que la querellante era indisciplinada ni evidencia sobre amonestaciones. Sin embargo, dicho informe incluyó múltiples anejos al respecto.[24] Por consiguiente, no procede su impugnación a estos efectos. Quinto, esta refuta el informe puesto que la licenciada no revisó el uso de drogas en la empresa. Este hecho es impertinente al objeto de investigación por el cual fue contratada. Por consiguiente, no proceden las impugnaciones fundamentadas en esto. Sexto, sobre el alegado incidente con el Sr. Luis Velázquez, la Lcda. Santana no examinó este asunto porque nunca hubo una queja

---

[24] *Id.*, *Informe*, en las págs. 177-191.

presentada. Así lo reconoció la propia querellante.[25] La licenciada recogió en su informe las declaraciones del testigo Carlos Caraballo, quien adujo que vio altercados entre gerentes, pero no quiso identificar las personas involucradas en estos.[26]

Como tercer señalamiento de error, la apelante sostiene que el Tribunal de Primera Instancia erró al desestimar sus alegaciones sin haber evaluado la credibilidad de los testigos, no obstante que existen aspectos subjetivos relacionados a la credibilidad de los testigos. Sin embargo, su indicación carece de especificidad sobre cuáles son dichos elementos que deben ser adjudicados mediante la celebración del juicio en su fondo. La contención de la apelante se limitó a una mera generalidad al respecto. El expediente ante nuestra consideración está fundamentado en declaraciones juradas, deposiciones y evidencia que merece nuestra deferencia. Por consiguiente, el Tribunal de Primera instancia no erró al dictar sentencia sumaria puesto que no es necesaria la adjudicación de credibilidad.

Por último, mediante el cuarto señalamiento de error la apelante aseveró que el Tribunal de Primera Instancia erró al desestimar las alegaciones relacionadas a los salarios adeudados sin que este asunto fuera planteado en la moción de sentencia sumaria adjudicada por este foro. En esencia, reclamó que no procedía la desestimación total de sus reclamaciones.

Nos corresponde señalar que, conforme a la *Ley de Procedimiento Sumario de Reclamaciones Laborales*, Ley Núm. 2 de 17 de octubre de 1961, 32 LPRA sec. 3118, los empleados pueden reclamar a su patrono "cualquier derecho o beneficio, o cualquier suma por concepto de compensación en caso de que dicho obrero o empleado hubiere sido despedido de su empleo sin justa causa". Asimismo, la *Ley para Establecer*

---

[25] *Id.* en la pág. 234.
[26] *Id.* en las págs. 171-172.

*la Jornada de Trabajo en Puerto Rico*, Ley Núm. 379 de 15 de mayo de 1948, 29 LPRA sec. 282, establece o siguiente:

> Todo empleado que reciba una compensación menor que la fijada en esta Ley para horas regulares y horas extras de trabajo o para el período señalado para tomar los alimentos tendrá derecho a recobrar de su patrono mediante acción civil las cantidades no pagadas, más una suma igual por concepto de liquidación de daños y perjuicios, además de las costas, gastos y honorarios de abogados del procedimiento.

La *Ley de Vacaciones y Licencia por Enfermedad de Puerto Rico*, Ley Núm. 180-1998, 29 LPRA sec. 250i, contempla reclamaciones de todo empleado que:

> reciba compensación inferior a la prescrita en esta Ley o en un convenio colectivo o en un contrato individual de trabajo tendrá derecho a cobrar mediante acción civil la diferencia adeudada hasta cubrir el importe total de la compensación que le corresponda, por concepto de salario, vacaciones, licencia por enfermedad o cualquier otro beneficio, más una cantidad igual a la que se le haya dejado de satisfacer, por concepto de compensación adicional, además de los costos, gastos, intereses y honorarios de abogados del procedimiento, sin que para nada de ello obste pacto en contrario.

Mediante el **párrafo cinco de la querella en cuestión, la apelante reclamó que se le adeudaban bonos y pagos por balance de enfermedad y vacaciones puesto que su salario había sido computado erróneamente**. Esta adujo que devengó un salario por hora inferior al correspondiente para un ejecutivo de ventas dentro de la empresa de la apelada. Su reclamo lo hizo a la luz de que fue víctima de discrimen por razón de sexo, demanda que fue desestimada.

El foro recurrido no adjudicó el alegado discrimen en el salario de la apelante; dispuso lo siguiente: "[e]n cuanto al pago de mesada incompleto, determinamos que la querellada no colocó en posición al tribunal para determinar que en efecto recibió menos de lo que le correspondía".[27] Sin embargo, **desestimó este reclamo fundamentado en el trato desigual respecto al despido, sobre las condiciones del baño y en la tasación de los vehículos *trade in***. El asunto sobre salarios y bonos adeudados no fue conforme a la Ley de Procedimiento Sumario de Reclamaciones

---

[27] *Id.*, *Sentencia*, en la pág. 686.

Laborales, Ley Núm. 2 de 17 de octubre de 1961, 32 LPRA sec. 3118, y la Ley para Establecer la Jornada de Trabajo en Puerto Rico, Ley Núm. 379 de 15 de mayo de 1948, 29 LPRA sec. 282. Este asunto no fue traído en la moción de sentencia sumaria de la parte apelada y el expediente ante nuestra consideración carece de evidencia al respecto para resolver este asunto. Por consiguiente, erró el Tribunal de Primera Instancia al desestimar este reclamo cuando no fue planteado en la moción de sentencia sumaria adjudicada.

**IV**

Por los fundamentos antes expuestos, se expide el auto de *certiorari* y se confirma la resolución recurrida, y se devuelve al Tribunal de Primera Instancia para que continúe los procedimientos exclusivamente respecto al reclamo de salarios y bonos adeudados bajo lo dispuesto en la *Ley de Procedimiento Sumario de Reclamaciones Laborales*, Ley Núm. 2 de 17 de octubre de 1961, 32 LPRA sec. 3118, y la *Ley para Establecer la Jornada de Trabajo en Puerto Rico*, Ley Núm. 379 de 15 de mayo de 1948, 29 LPRA sec. 282.

**Notifíquese.**

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones